James Morgan and others, Respondents, *v.* Edward King and others, Appellants.

The public have a right of way in every stream which is capable, in its natural state and its ordinary volume of water, of transporting, in a condition fit for market, the products of the forests or mines, or of the tillage of the soil upon its banks.

The capacity for transporting these products is sufficient, if, in its natural and ordinary state, it can be of public use in the transportation of property, either with or without the use of vessels, etc.

Such capacity need not be continuous. If it is, ordinarily, subject to regular periodical fluctuations, attributable to natural causes, and continuing sufficiently long to make it useful as a public highway, it is subject to the public easement.

Portions of Racket river, between Colton and Raymondsville, are not a public highway: consequently, the public easement does not attach thereto.

A statute declaring a private stream, on which riparian owners have vested interests, a public highway, without providing compensation to the owners, &c., is null and void.

Appeal from a judgment of the Supreme Court, in the fourth district, affirming a judgment in favor of the plaintiffs, entered upon the decision of a single judge.

The action was brought for obstructing the passage of saw logs of the plaintiffs. in floating down the Racket river, near Potsdam, in the county of St. Lawrence. The plaintiffs were the owners of certain premises on the river, about five and a half miles below Potsdam, on which were erected a dam and a saw-mill. About two and a half miles above the plaintiffs premises, the defendants owned land on both sides of the river, on which stood a saw-mill, and across the river at that point they had a dam and boom for detaining logs. Both parties claimed title through the same patent from the State, granted in 1787, the defendants' title being prior, in time, to the plaintiffs', and the plaintiffs' deed being subject to previous grants to the millowners above. The patent covered a large tract of land, without any reservation, except of gold and silver mines and one-twentieth of the land for highways. The plaintiffs' logs were detained in their passage down the

river by the defendants' booms, and that was the obstruction complained of..

The cause was tried at the St. Lawrence Circuit in October, 1855, before a justice of the court, without a jury. The justice decided that the defendants had no right to detain the plaintiffs' logs, holding that Racket river, in its natural state, being of sufficient capacity to float logs and timber to market in seasons of high water, is a public highway, at common law; that the title of the riparian owners is subject to the public easement; and that the plaintiffs are not estopped by their deed from insisting that the defendants have no right to obstruct the river so as to impair the public use.

From the judgment entered on the decision, the defendants appealed to the General Term, where the judgment was affirmed by a divided court, and the defendants have appealed to this court.

The material facts of the case are stated in the opinion.

*William A. Dart,* for the appellants.

*John H. Reynolds,* for the respondents.

Smith, J. The only question in this case is, whether the Racket river is, of public right, a common highway, at the point where its waters are obstructed by the defendants' dam. If it is such, the rights of the defendants, as riparian owners, are subject to the public easement; and they are liable for detaining the plaintiffs' logs in their passage down the stream. If, on the other hand, the river is not a common highway, but is wholly private, in use as well as in ownership, the defendants are not liable.

In considering the question, it will be useful to state in the outset, with some particularity, the facts found by the court, respecting the character and capacity of the stream. Racket river is one hundred and sixty miles long, it having its source in the county of Hamilton, as the outlet of several mountain lakes, and running northwardly through the counties of Franklin and St. Lawrence, till it empties into the St. Lawrence river. From its mouth to Raymondsville, twenty miles,

it is boatable, and was declared a public highway in 1810; from Raymondsville to Potsdam, fourteen miles, the bed of the river is rocky, and rises two hundred and fifty feet, and the stream is rapid and rough; from Potsdam to Colton, nine miles, its bed rises four hundred feet; between Colton and Racket lake are nine different falls or rapids, over which neither boats nor canoes can pass, but down which logs may be floated; and between these falls and rapids are basins of smooth water, navigable by vessels, boats and rafts; and one of these stretches of navigable water is fifty-two miles long, with but one mile of rapid. The average width of the river is eighteen rods. From Colton to Raymondsville, the river, in its natural state, was not capable, at any season, of being navigated by vessels, barges, lighters or rafts; but during the seasons of high water, which were generally of about two months' duration in each year, it had capacity to float to market saw-logs and timber in single pieces; but the logs and pieces of timber, so floated, had to be aided in their passage by men in skiffs, canoes or on shore. At the point where the defendants' mill is erected, there was, in the natural state of the river, a sharp rapid, falling several feet, at the top of which was a rocky island, in the middle of the river. The channel west of the island contained many large boulders; and the east channel was quite shallow, with many small boulders. At low water, a man might cross the river by stepping upon the boulders, without getting wet. Eighteen inches of water in the river would not cover the boulders, and, at that height of water, logs could not float there; and the usual rise of the river in spring freshets, above the ordinary height of water, was from three to three and a half feet. The defendants' dam was erected in 1849; their boom was constructed across the river early in March, 1850; and the plaintiffs' dam and mill were erected in 1853. From 1810 to 1850, logs, lumber and square timber, in small quantities, were occasionally floated, in spring freshets, from the head of the point two miles above Potsdam, to a mill six miles below the village; but, previously to 1850, no logs or lumber were floated past Colton to Potsdam, except such as escaped by the

breaking of booms above; and such logs were sometimes badly injured, and the ends were always more or less broomed up. In the winter of 1850, the legislature made an appropriation for the improvement of the river, which was followed by an expenditure of fifteen thousand dollars of public money upon the portion of the river above Potsdam; and in April, 1850, the legislature declared the river a public highway for the purpose of floating logs and lumber from Racket lake to its mouth. The detention of logs, which occasioned this suit, occurred in 1854. There are now in operation, between the plaintiffs' mill and Colton, besides several custom mills, and other mills, factories and machinery, nine saw-mills, some of which cut forty-five thousand feet of lumber per day. The country bordering on the river, from about five miles above Colton to its confluence with the St. Lawrence, a distance of about fifty miles, is principally improved, and held and used for farming purposes; and most of the lumber now floated on the river comes from the lands bordering on the stream and its tributaries above Colton.

The question presented for decision must be considered independently of the statutes of 1810 and 1850, declaring the Racket river a public highway. The former statute does not touch the matter in dispute, as it relates to only that portion of the river below Raymondville, and the defendants' dam is several miles above that point. The act of 1850 declares the river a public highway for the purpose of floating logs and lumber from the foot of Racket lake to the mouth of the river, but it was passed subsequently to the construction of the defendants' dam and boom, and it does not provide compensation for taking the private property of the owners of the banks and bed of the stream. If, prior to the passage of the act, the stream was private, in use as in property, the legislature could not take away the rights of those who were then riparian owners, nor subject such rights to a public use, created or authorized by the act itself, without compensation. In examining the question, reference must be had to certain rules of the common law existing in this State at the time when the defendants placed in the river the constructions

complained of; and, upon applying those rules to the facts in this case, the question will be determined.

By the common law of England, those rivers are navigable in which the tide flows and reflows; all others are not navigable. Upon this distinction is based a very important rule relating to the ownership of the bed of the stream and the right of fishery in its waters, to wit, that navigable or tidal rivers, so far as the tide ebbs and flows in them, belong to the king; and rivers not navigable, that is, fresh water rivers, belong to the owner of the adjacent soil. The distinction has no reference, however, to the right to use the stream for the purpose of passage or transportation, the rule in that respect being that the public have not only a right to all tide waters, but also a right of way or easement paramount to the rights of the riparian owners, in all rivers which, though not tidal or navigable in the sense of the former rule, are navigable in fact. And, by the same law, a river is, in fact, navigable, on which boats, lighters or rafts may be floated to market. (Hale, *De Jure Maris; Ex parte Jennings,* 6 Cow., 518.)

Within the rule just stated, the Racket river could not be deemed navigable, in fact, in its natural state, since it was not capable, even in high water, of floating to market any craft mentioned by Lord Hale. But it is claimed by the plaintiffs, that the natural capacity of the river to float saw-logs and timber, in single pieces, to market, in seasons of high water, was of such public utility as that, by the common law of this country, the stream was a public highway for the purpose of that species of transportation.

There can be no doubt that the rule of the common law, as to what degree of capacity renders a river navigable, in fact, should be received, in this country, with such modifications as will adapt it to the peculiar character of our streams, and the commerce for which they may be used. This accords with the general principle of the common law of England, that English subjects, colonizing a new country, carry with them only so much of the laws of the mother country as is applicable to their own situation and the condition of an infant colony. (1 Bl. Com., 107.) It is also consistent with

the nature of the rule itself, which is but an outgrowth or product of the peculiar circumstances and necessities of the people with whom it originated, in respect to the use of their inland waters for the purposes of trade and commerce. In this country, we have many streams of considerable extent, not navigable by boats, lighters or rafts, but capable of floating to market single logs or sticks of timber. In many cases, large tracts of land bordering upon their banks were originally covered with dense forests, the valuable products of which would have had no avenue to market if the public easement in the streams had been restricted to navigation by boats or rafts. The true rule is, that the public have a right of way in every stream which is capable, in its natural state and its ordinary volume of water, of transporting, in a condition fit for market, the products of the forests or mines, or of the tillage of the soil upon its banks. It is not essential to the right that the property to be transported should be carried in vessels, or in some other mode, whereby it can be guided by the agency of man, provided it can ordinarily be carried safely without such guidance. Nor is it necessary that the stream should be capable of being thus navigated against its current, as well as in the direction of its current. If it is so far navigable or floatable, in its natural state and its ordinary capacity, as to be of public use in the transportation of property, the public claim to such use ought to be liberally supported.

Nor is it essential to the easement that the capacity of the stream, as above defined, should be continuous, or, in other words, that its ordinary state, *at all seasons of the year*, should be such as to make it navigable. If it is ordinarily subject to periodical fluctuations in the volume and height of its water, attributable to natural causes, and recurring as regularly as the seasons, and if its periods of high water or navigable capacity ordinarily continue a sufficient length of time to make it useful as a highway, it is subject to the public easement. These general views are in harmony with those maintained by the Supreme Court of Maine, in *Browne* v.

*Chadbourne* (31 Maine, 9), and by the Supreme Court of Michigan, in *Moore* v. *Sanborne* (2 Gibbs, 519).

But, upon an examination of the facts found in the present case, it is apparent that the portion of the Racket river, which is between Colton and Raymondsville, and includes the defendants' mill seat, was not, in its natural state, a public highway, even within the liberal rules above laid down. It was not capable of floating even single logs, except during seasons of high water, which were about two months in a year, and the logs so floated had to be aided in their passage by men in skiffs, canoes or on shore. The current was so broken and impeded by rapids and rocks, that, from 1810 to 1850, logs, lumber and square timber, in small quantities only, and but occasionally, were floated from a point two miles above Potsdam to mills, from four to six miles below the village, and, previously to 1850, no logs or lumber were floated past Colton to Potsdam, except such as escaped by the breaking of booms above; and such logs were sometimes badly injured, and the ends were always more or less broomed up. It would be going beyond the warrant of either principle or precedent to hold that a floatable capacity, so temporary, precarious and unprofitable, constituted the stream a public highway. (*Munson* v. *Hungerford*, 6 Barb., 265 ; *Curtis* v. *Keesler*, 14 id., 511.)

The case is to be decided without reference to the effect, which artificial improvements have had upon the navigable capacity of the river. As I understand the finding of facts, the present capacity of the stream in high water, to transport thousands of single logs annually from Racket lake to the many extensive mills now on its banks below Colton, is owing to the improvements that have been made by the expenditure of large sums of money appropriated for that purpose by public act, since the defendants built their dam and boom.

The first statute appropriating money for that purpose was passed on the 9th of April, 1850. It appropriated the sum of $10,000 for " clearing and improving the rafting channel of Racket river," and certain of its tributaries, and " for the construction of such piers, booms and dams as may be neces-

sary for the passage of logs and other lumber over and through said channel." The act, already referred to, declaring the river a public highway, for the purpose of floating logs and lumber from its mouth to Racket lake, wa spassed at the same session, and, indeed, on the very next day. It prohibited the future erection of any dam upon that part of the stream without an apron of certain described dimensions, for the passage of logs and timber. It recognized the right of the owners of dams and booms already constructed to maintain them, and provided that "persons desirous of floating logs or lumber down said stream may construct a shoal or apron in connection with any dam across the stream, and may reconstruct any booms already constructed in said stream, in such manner as to allow logs and lumber to pass by the same, doing no unnecessary injury to the owner or occupant of said boom, and paying to such owner or occupant such damages as he or they may sustain by reason of the alteration of said dam and boom." In 1851 the latter act was amended by providing for the appointment of commissioners to appraise the damages of the owners or occupants of such dams or booms.

Reading these acts together, it is apparent that the legislature regarded the Racket river as not capable, in its natural state, of being used as a public highway for floating logs, but as susceptible of being made so by the expenditure of the sums appropriated for its improvement, and that they recognized the rights of the owners of dams and booms, then existing, as superior to the public easement, and as property that could not be taken for public use without compensation.

In the present case, the plaintiffs did not attempt to avail themselves of the privilege created by the act, of altering the construction of the defendants' dam and boom, on making compensation, but they assumed the untenable position that the defendants' rights were subject to the public use.

The judgment should be reversed.

All the judges concurring, except POTRER, J., who took no part in the decision.

Judgment reversed, and new trial ordered.