ANNE S. VAN CORTLANDT et al., Appellants and Respondents, *v.* THE NEW YORK CENTRAL RAILROAD COMPANY, Respondent and Appellant.

(Argued June 6, 1934; decided October 2, 1934.)

*Kenneth O. Mott-Smith, Frederick L. Wheeler* and *Jacob Aronson* for defendant, respondent and appellant.

*E. J. Dimock, M. Gregg Latimer, C. O. Donahue* and *Eleanor S. Burch* for plaintiffs, appellants and respondents.

CRANE, J.   The plaintiffs have sought by this action to obtain a judgment declaring the rigid and immovable railroad bridge of the defendant over the Croton river to be an unlawful obstruction and a public nuisance, and further directing its removal.   The trial court dismissed the complaint on the ground that the Croton river was non-navigable and that, moreover, the plaintiffs were guilty of laches in failing to make any move or objection for a period of over forty years.   The Appellate Division reversed many of the findings of fact and conclusions of

law, made new findings, but failed to afford the plaintiffs the asked for relief. Both sides have appealed: the plaintiffs because an immediate injunction has been denied them, and the defendant because the court has found the river to be navigable, the crossover a public nuisance, the plaintiffs not barred by laches and possibly entitled to relief later when conditions have changed. As there has been a reversal on the facts this court has jurisdiction to review the facts and could, therefore, determine whether the evidence is such as to sustain the new findings made by the Appellate Division. In the view which we have taken of the case we think it unnecessary to pass on many of these questions, as we are of the opinion that the plaintiffs cannot maintain this action for the reasons which we shall attempt to state.

The Hudson River Railroad Company was chartered and organized by chapter 216 of the Laws of 1846, entitled, "An Act to Authorize the Construction of a Railroad from New York to Albany." Section 15 of the act provided:

" § 15. The said corporation is hereby authorized to build or erect a bridge over the Spuytenduyvel creek and other navigable streams or inlets, for the passage of the said road or ways, from or to the city of New York. Such bridges shall be substantially constructed, and shall contain a draw of sufficient width to admit the passage of vessels adapted to the navigation of said river, streams or inlet, with standing masts, and shall be so attended as not to obstruct, delay or hinder, the progress of any vessel navigating said river. They are also required to construct such bridges as may be necessary to provide for the free passage of such vessels and boats as heretofore have or now can pass into and from the same, the bays that may be crossed by said railroad; and if any wharf or dock shall be cut off by the said railroad, the said company shall extend or so improve the same as to restore it to its former usefulness, so far as it may be practicable to do so. And

the owner or owners thereof are hereby authorized to occupy the river front, outside of said railroad, for the erection and use of wharves or docks."

The defendant is the successor to the Hudson River Railroad Company.

The courts below have treated this act as if it required a drawbridge over any stream which was navigable in fact or in law at any time; such as came within the definition of " navigability " found in the court decisions. We think the act must be interpreted in the light of legislative intent. The plaintiffs' claim rests entirely upon the meaning of this act. No question of Federal authority is involved in the case. If the Croton be non-navigable the consent of the Secretary of War to the erection of the railroad bridge was unnecessary; if navigable, nowhere does it appear that such consent was not given. (*Egan* v. *Hart*, 165 U. S. 188.) The State of New York may improve its highways in such fashion as it deems best for travel even to the extent of erecting bridges without draws over navigable streams unless or until some act of Congress takes cognizance of the matter. Until Congress acts the State may act. In this charter to the railroad the State has provided for drawbridges in certain cases, but, bearing in mind its power in the absence of Federal control, we must decide what are those cases, what the charter act means. No rights, we may repeat, arise from the Croton being navigable or unnavigable. The plaintiffs' claim rests entirely upon the statutes. The nature of a navigable stream is stated in *United States* v. *Holt State Bank* (270 U. S. 49, 56) as follows: " that they are navigable in fact when they are used, or are susceptible of being used, in their natural and ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water; and further that navigability does not depend on the particular mode in which such use is or may be had — whether by steamboats, sailing

vessels or flatboats — nor on an absence of occasional difficulties in navigation, but on the fact, if it be a fact, that the stream in its natural and ordinary condition affords a channel for useful commerce." (See, also, *Economy Light Co.* v. *United States*, 256 U. S. 113.) The New York definition may be even a little broader. (*Morgan* v. *King*, 35 N. Y. 454.)

The power of the States over navigable streams in the absence of congressional action may be illustrated by the case of *Gilman* v. *Philadelphia* (70 U. S. 713, 720), where bridges without turnspans were erected over the Schuylkill, shutting out the customary passage of sailing vessels to the plaintiff's wharves. " Vessels with masts could not pass, and the property of the complainant was rendered less valuable.' The court said, " The injury to the property of the complainants will be entirely consequential. A large city is rising up on the opposite side of the river. The new bridge is called for by public convenience " (p. 722). " The defendants are proceeding to build the bridge under the authority of an act of the legislature of Pennsylvania. The Schuylkill River is entirely within her limits, and is ' an ancient river and common highway of the State.' For many years it has been navigable for masted vessels for the distance of about seven and a half miles only, from its mouth. * * * It must not be forgotten that bridges, which are connecting parts of turnpikes, streets, and railroads, are means of commercial transportation, as well as navigable waters, and that the commerce which passes over a bridge may be much greater than would ever be transported on the water it obstructs " (pp. 721, 729). The plaintiff was denied relief.

*Hamilton* v. *Vicksburg, Shreveport & Pacific R. R.* (119 U. S. 280, 281) is another example. The court, through Mr. Justice FIELD, said: " The authority vested by its act of incorporation in the Vicksburg, Shreveport, and Texas Railroad Company to construct a railroad from a point

opposite Vicksburg to the State line of Texas, empowered it to construct as part of the road all necessary bridges for the crossing of navigable streams, which might be on its line. * * * What the form and character of the bridges should be, that is to say, of what height they should be erected, and of what materials constructed, and *whether with or without draws*, were matters for the regulation of the State, subject only to the paramount authority of Congress to prevent any unnecessary obstruction to the free navigation of the streams. Until Congress intervenes in such cases, and exercises its authority, the power of the State is plenary. When the State provides for the form and character of the structure, its directions will control, except as against the action of Congress, whether the bridge be *with or without draws, and irrespective of its effect upon navigation.*" (See, also, *Transportation Co. v. Chicago*, 99 U. S. 635.)

In granting this charter to the Hudson River Railroad Company in 1846 the State Legislature was not obliged to provide a drawbridge over the Croton river by reason of anything in the United States Constitution or the acts of Congress so far as the record here discloses. No such claim is made. The Legislature was, therefore, free to declare in what instances and cases the drawbridge should be constructed. This is the only point we desire to make for the present, and it merely emphasizes what we have heretofore said, that the intent must govern, not merely the navigability of the streams. Now what was the intent, and did it ever cover such conditions as exist to-day?

In 1846, and for many years thereafter, the Croton was used in navigation, having two or more mills or factories on its banks. Sailing vessels passed through the draw which the defendant maintained in its railroad bridge. By 1891 all had changed, with the inroads of time. The factories and mills had been demolished and all traffic in the river had ceased.

The plaintiffs are the owners of 153.09 acres of land east of the New York Central's railroad tracks and south of Harmon station and the village of Croton. The Croton river runs through their property at least up to the Albany Post road, a distance of twenty-four hundred feet east of the railroad bridge. This road is carried over the waters of the Croton on a masonry arch bridge at the southerly end and a culvert at the northerly end, with a fill or causeway seven hundred and thirty feet in length between them. The bridge culvert and fill are permanent structures erected by the county of Westchester and State of New York in the years 1922–1924. There is no claim made in this case that the Croton is navigable beyond this roadway. Whatever may have been its condition before the construction of this Post road crossing, there is now no possibility of any commercial navigation on the river beyond the road. No claim is made in this case, not even a suggestion, that the roadway, this shutting off any navigation, is illegal or a public nuisance. We, therefore, have the case presented, where navigation, if any, can under any and all circumstances run only from the railroad to the Albany Post road through the plaintiffs' marsh lands, a distance of about a half mile.

These 153.09 acres owned by the plaintiffs consist of 35.45 acres of upland, 51.64 acres of lands under water, called sedge lands, and 66 acres under water. Between the deep water of the Hudson and the Albany Post road bridge, such channel as exists is at best 80 feet wide, with a minimum depth of 5 feet at mean high tide and 1.6 feet at mean low tide. These 51 acres of sedge or marsh lands are on the north and south side of this channel between the railroad and the bridge. They have apparently always been in the same condition, for the evidence fails to show any use made of them or of the stream by the plaintiffs or their predecessors.

For many years prior to 1891 the portion of the defendant's railroad constructed over and across the Croton

river consisted of two tracks upon a trestle, with a span therein capable of being elevated and swung to one side to admit boats in compliance with the above quoted section of its charter. The last time such lift span was operated and the last time there was any need for the operation thereof was in 1888, and during the preceding decade said lift span was operated on a few occasions only. The chief engineer of the defendant, in a letter to the vice-president, Mr. H. Walter Webb, dated January 22, 1898 (Defendant's Exhibit NN), wrote: " The entire length of the present structure is about 404 ft. and consists of seven short spans, one of which was originally built for a draw span. It has been opened but once or twice in the past 18 years, and not at all within the past five years, and there now exists a bar across the mouth of the river west of the bridge, having but 3 ft. of water at low tide, so that there is no longer a navigable channel, and of course the completion of the Cornell Croton Dam will make even less water to pass through this opening; therefore, there now exists no reason whatever for continuing the further maintenance of a draw span." While this letter may be a self-serving declaration or hearsay it is in accordance with all the other evidence, with the possible exception of the statement that there is no longer a navigable channel. We have already seen that this had narrowed to 80 feet. The letter, however, is evidence that the defendant was informed by its chief engineer and thus knew that the draw was no longer necessary. The evidence warrants the statement that there was no reason whatever for continuing the further maintenance of a draw span. The evidence is conclusive and so also the findings that for over forty years no one has had any reason to use a draw through the railroad bridge, no boat has sought to go in or out, and has had no occasion to do so; there was no place to go, no commerce, no business of any kind, no user of adjoining property requiring or demanding navigation, even were navigation possible.

The plaintiffs do not claim that they or their predecessors ever used or desired to use the river channel for boats of any kind. Not a person has come forward to say that at any time he or anybody else in the past half century desired to use the river for commerce and was prevented or hindered by the bridge. The fact is that the river had been abandoned for navigation. The factories formerly on its shores had been demolished, its water had been diverted for a New York city aqueduct, a broken dam had clogged its upper waters and a drift in its currents had collected sand and mud, narrowing its channel. West of the railroad bridge a sand bar had stretched out across the mouth of the river so that Captain Bowers, making the experiment, had hard work driving his tug *The West Farms* up through the mud to a point near the railroad bridge. Navigation might have been possible but no one evidently desired to try it. The whole community apparently considered this river as no longer requiring an open draw at the railroad bridge. The plaintiffs do not now insist upon a change because of any desire to use it either for themselves or others; the utmost of their claim is, that their property will be more valuable if there is the possibility of a future use by dredging and bulkheading, and an open draw through which boats may perhaps come when such work is complete. No such proposed plans are in the offing; so far they are only on paper; the sum of $410,520 is necessary to be spent by the plaintiffs on this 2,400 feet of sedge channel before any occasion can arise for the use of the drawbridge. (The Appellate Division raised the cost to $700,000.) This is the sum Mr. Charles A. Ellcms, Jr., says is required to make proper docks and water ways from the railroad bridge to the Albany Post road for commercial navigation.

What is the plaintiffs' present injury? As at present constituted the Croton cannot be used for commerce. The plaintiffs own both sides of the river up to the Post

road. It is evident and conceded that changes will have to be made by the expenditure of large sums of money to make possible commercial user. It is this change in conditions which will give increased value to the plaintiffs' holdings, not merely the installation of an open drawbridge. The real estate experts for the defendant stated that the value of the property with and without the draw was the same. Mr. William J. Yates, for the defendant, testified:

" Q. What in your opinion is the fair market value of the property? A. $117,878.

" Q. What, in your opinion, would be the fair market value of the property, assuming a draw span was installed in the railroad bridge? A. There would be no difference in my value.

" Q. $117,878? A. Yes, sir."

True, Mr. William R. Bull, for the plaintiffs, said the present value was $447,500, and $893,000 with the bridge open. The Appellate Division in making new findings believed Mr. Yates, for the new or modified finding reads, " The value of the plaintiffs' property, described in the foregoing findings numbered ' 3 ' and ' 4,' does not exceed $117,878." While the Appellate Division elided the Special Term's finding, "And it would not be increased if a draw span should be installed in said bridge," the Appellate Division failed to find the reverse, that it would be. In other words, it refused to find as requeste by the plaintiffs, that " if a draw were maintained in the defendant's bridge, the plaintiffs' property would be substantially more valuable than it is with the bridge immovable and rigid."

There is no finding that the plaintiffs are at present caused any injury, special injury or damage by the maintenance of the rigid rail crossing. The Appellate Division's intimation is to the contrary. The new findings read: " There is no evidence that plaintiffs have ever lost any rents or profits from leasing their property by

reason of the construction, maintenance and operation of defendant's bridge across the Croton," and " The maintenance of defendant's rigid and immovable bridge across the mouth of the Croton river proximately causes special damage to the plaintiffs in the nature of substantial and peculiar injury different from that of the general public but not of such a character as a court of equity will at present assess or use as the basis for an injunction."

What this special and peculiar damage is the court fails to state. If it be insufficient to move a court of equity it must be nominal in the absence of other considerations. There is at present no material or substantial damage being done to the plaintiffs or their property by the maintenance of the present railroad structure. The extravagance of the estimates of the plaintiffs' witness, Mr. Bull, is suggested by comparisons. He said the present value of the property in question is $447,500, yet there is a finding, unreversed, that the assessment for taxation for the year 1930 was $13,000.

The premises we have been considering are a part of the original manor of Cortlandt which was granted by royal charter to Stephanus Van Cortlandt in 1697, and since that date have been owned by his descendants, and are now owned and in the possession of the plaintiffs. The plaintiffs' ancestor, Pierre Van Cortlandt, conveyed to the Hudson River Railroad Company, by deed dated August 23, 1847, the lands and lands under water, upon which the defendant's bridge over the Croton river was originally constructed, and upon which its bridges now stand.

As before stated, up to 1891 the railroad maintained an open draw in its bridge, but in that year the draw-tower was dismantled and the ends of the lift span were spiked, and thereafter said bridge was maintained as a rigid structure until in or about the year 1898 when it was replaced by the present struss structure. In 1907 girder structures were erected for two additional tracks. The

four main tracks are without any draw span or bridge, and this has been the condition since 1891. Immediately north of the defendant's bridge are located the Harmon station and the shops and yards used for the repair and storage of the defendant's electric and steam locomotives. Trains or engines pass over the bridge on an average of one every three minutes. In the year 1929 the bridge was used for the transportation of 5,916,768 passengers and for the movement of 5,404,644 net tons of freight. The installation of a draw span in the defendant's bridge structures and the changes incident thereto would cost upwards of $3,000,000.

During all these years and amidst all these changes, which were made within full view of the plaintiffs' home and must have come to their knowledge, no protests were made and no requests or demands for an open bridge. Acquiescence for all these years is strong evidence that the parties never thought they were being injured in any way. While this lapse of time may not preclude the plaintiffs from maintaining an action to enjoin the continuance of a public nuisance when they are suffering special and peculiar damage different from the public generally (*Galway* v. *Metropolitan Elevated Ry. Co.*, 128 N. Y. 132; *Bremer* v. *Manhattan Ry. Co.*, 191 N. Y. 333; and *Weeks-Thorne Paper Co.* v. *Glenside Woolen Mills*, 64 Misc. Rep. 205; 140 App. Div. 878; 204 N. Y. 563), yet there is no reason in the world why persons suffering such injury should not act promptly or why their delay may not be considered as bearing upon the extent and materiality of the supposed injury. While the right to an action may not be barred, we must all admit that a delay of forty years strongly inclines one to think that there can be no justification for an action, *i. e.*, no injury. Special damage must be proved resulting from the public nuisance before relief will be afforded to a plaintiff. ANDREWS, J. (later of this court) in *Old Forge Co.* v. *Webb* (31 Misc. Rep. 316, 321); *Rumsey* v. *N. Y. & N. E. R. R. Co.* (133 N. Y. 79, 87).

As said in *Mississippi & Missouri R. R. Co.* v. *Ward*
(67 U. S. 485, 492), " The private party sues rather as
a public prosecutor than on his own account; and unless
he shows that he has sustained, and is still sustaining,
individual damage, he cannot be heard. * * * Then,
again, the obstruction to navigation must be plainly a
nuisance within this rule before it can be removed by
decree. If the proceeding was by indictment, and the
jury doubted whether the obstruction was a nuisance or
not, they would be instructed to acquit the defendant;
and so, if this case was referred to a jury to try the fact,
and they doubted, they would be bound to acquit. And
the same rule applies in a Court of Chancery where the
Court ascertains the fact of nuisance." (See, also, *City of
Georgetown* v. *Alexandria Canal Co.*, 37 U. S. 91, p. 99.)
" Even an unlawful obstruction may not be abated as a
nuisance at the suit of private persons if the State does
not complain, and there is no showing of special damage
by the champions of the public right." (*People ex rel.
Lehigh Valley Ry. Co.* v. *Tax Comm.*, 247 N. Y. 9, p. 16.)
See further limitations implied in *Fort Plain Bridge Co.*
v. *Smith* (30 N. Y. 44, 62). " Because a bridge over a
navigable stream may be a nuisance to those navigating
it, it does not follow that it is a nuisance as to others who
do not navigate it."

If this bridge be unlawful, as claimed by the plaintiffs,
it is because it is a public nuisance. Such is indictable.
(*Kinney* v. *Koopman & Gerdes*, 116 Ala. 310.) The State
has taken no action for all these years and is not now
seeking any relief.

When the Legislature of 1846 said to the defendant's
predecessor that it could put a railroad bridge over the
Croton river — " other navigable streams or inlets "—
and that " such bridges * * * shall contain a draw
of sufficient width to admit the passage of vessels *adapted*
to the navigation of said river, streams or inlet, with
standing masts," there is very grave doubt, when con-

sidering the nature of the Croton at that time, whether there was any intent to have such a provision apply to a remaining bit of the original stream shut off by a highway 2,400 feet above the railroad crossing, unused for over forty years and of no commercial value now until its channel has been improved by the expenditure of three-quarters of a million of dollars.

For this reason, and because the plaintiffs have failed to prove sufficient special damage to maintain this action, the judgment of the Appellate Division should be reversed, that of the Special Term affirmed, and the complaint dismissed, with costs to the defendant-appellant in this court and in the Appellate Division.

POUND, Ch. J., LEHMAN, O'BRIEN, HUBBS, CROUCH and LOUGHRAN, JJ., concur.

Judgment accordingly.