*600 OPINION OF THE COURT
Ciparick, J.
This case presents the Court with the opportunity to decide to what extent recreational use can be considered in determining whether a river is navigable-in-fact. The river at issue is the South Branch of the Moose River (the South Branch), 12 miles of which run through property owned by plaintiff Adirondack League Club, Inc. (ALC). On June 15, 1991, the individual defendants traveled down this portion of the South Branch in two canoes and a kayak, an endeavor that required several portages around various obstacles in the river. ALC, a private club, preserves 50,000 acres around this portion of the South Branch for use, including hunting and fishing, by its members. After defendants’ trip, ALC sued the Sierra Club, which organized the excursion, and the five individual defendants, some of whom are members of the Sierra Club, for trespass. ALC claims that this section of the South Branch is its private property. Defendants counter that because the South Branch is navigable-in-fact, they were entitled to use the easement reserved to the public in all such waterways. The State of New York and the Adirondack Mountain Club, Inc. intervened as defendants and along with the other defendants moved for summary judgment on the issue of navigability of this portion of the South Branch.
This Court must decide, based on the common-law standard of navigability-in-fact, whether factual questions exist as to the South Branch’s navigability. Like the Supreme Court and the two-Justice dissent in the Appellate Division below, we conclude that summary judgment is not warranted. We hold, however, that evidence of the river’s capacity for recreational use is in line with the traditional test of navigability, that is, whether a river has a practical utility for trade or travel. Since questions of fact remain regarding whether the South Branch is navigable-in-fact, plaintiff is entitled to have the competing evidence weighed and the credibility of the witnesses assessed at trial. Accordingly, we modify.
*601 L
The parties differ regarding the type of evidence that will suffice to satisfy the standard of navigability-in-fact. Specifically, the parties differ on the extent to which recreational use should enter into the analysis. Appellant ALC contends that navigability references only commercial utility and that the focus thus should be on the South Branch’s use as a logging river during the first half of this century. Reliance on recreational uses, ALC asserts, would disrupt settled expectations regarding private property and would expand the common-law rule beyond its traditional foundation. Defendants argue that recreational and commercial use are both properly part of the analysis.
As a general principle, if a river is not navigable-in-fact, it is the private property of the adjacent landowner. If, however, a river is navigable-in-fact, it is considered a public highway, notwithstanding the fact that its banks and bed are in private hands (Morgan v King, 35 NY 454). This rule is longstanding and recognizes that some waterways are of such practical utility that private ownership from the time of the original grant from the State or sovereign is subject to an easement for public travel (see, id., at 458). Typically, such utility implicated commerce. The seminal case of Morgan v King sets forth the standard for navigability-in-fact:
“[A] river is, in fact, navigable, on which boats, lighters or rafts may be floated to market * * * [Additionally,] the public have a right of way in every stream which is capable, in its natural state and its ordinary volume of water, of transporting, in a condition fit for market, the products of the forests or mines, or of the tillage of the soil upon its banks. It is not essential to the right, that the property to be transported should be carried in vessels, or in some other mode, whereby it can be guided by the agency of man, provided it can, ordinarily, be carried safely, without such guidance * * *. If it is so far navigable or floatable, in its natural state and its ordinary capacity, as to be of public use in the transportation of property, the public claim to such use ought to be liberally supported” (id., at 458-459).
Necessity of use by the public was essential to the Morgan Court when it crafted this definition from its English ancestor. *602 Inasmuch as the English common-law rule was “but an outgrowth or product of the peculiar circumstances and necessities of the people with whom it originated,” the New York rule found its basis in New York necessities (id., at 459). Because “valuable products”, namely timber, “would have no avenue to market” the public easement could not be restricted, as in England, to those streams navigable by boats or rafts. Instead, those “capable of floating to market single logs or sticks of timber” could be also deemed navigable-in-fact (id., at 459).
In addition to Morgan v King, ALC relies on Douglaston Manor v Bahrakis (89 NY2d 472) in which we quoted a “commercial” definition of navigable-in-fact from the Navigation Law — a river is navigable-in-fact if it is
“ ‘navigable in its natural or unimproved condition, affording a channel for useful commerce of a substantial and permanent character conducted in the customary mode of trade and travel on water * * * hav[ing] practical usefulness to the public as a highway for transportation’ ” (id., at 480, quoting Navigation Law § 2 [5]).
The Court in Douglaston Manor, however, was not asked to decide whether a waterway was navigable-in-fact. Instead, the Court had to determine whether the public had a right to fish in the Salmon River, which was concededly navigable-in-fact. In holding that the public did not have that right, the Court maintained the distinction between those waters that are navigable-in-law, that is, those that partake of the sea and are thus dedicated to the public use, including the right to fish, and those waters, above the tide, that are navigable-in-fact, over which the public retains only a servitude for transportation.
Using this navigability language from Douglaston Manor as persuasive authority, however, does not necessarily bolster ALC’s view that the ability to carry goods to market is the sole criteria in determining the question of navigability. Both the Navigation Law definition and that of Morgan have as their touchstone the idea that a river must have “practical usefulness to the public as a highway for transportation” (Navigation Law § 2 [5]). The fact that before the middle of the 20th century a river’s practical utility was measured by its capacity for getting materials to market does not restrict the concept of usefulness for transport to the movement of commodities. Although *603 evolving necessities and circumstances may warrant a different emphasis regarding a river’s usefulness, the central premise of the common-law rule remains the same — in order to be navigable-in-fact, a river must provide practical utility to the public as a means for transportation. Thus, while the purpose or type of use remains important, of paramount concern is the capacity of the river for transport, whether for trade or travel (see, Van Cortlandt v New York Cent. R. R. Co., 265 NY 249, 254-255; Fulton Light, Heat & Power Co. v State of New York, 200 NY 400, 412; Fairchild v Kraemer, 11 AD2d 232, 235).
Certainly, as all members of the Appellate Division panel held, evidence of recreational use will support a finding that a river is susceptible to commercial use. Beyond this, however, evidence of a river’s practical utility for transport need not be limited to evidence of its capacity for the movement of commercial goods. By offering opinions of river guides regarding the feasibility of running boat tours of the South Branch, both plaintiff and defendants correctly recognize that recreational boating has commercial aspects. More importantly, however, unlike the circumstances presented to this Court when Morgan was decided in 1866, the necessity of using the South Branch as a means of moving goods in commerce has waned. Once one of the five busiest rivers in New York for the transport of logs, it appears that the South Branch has not again been used for that purpose since 1948, and the possibility of such use in the future is unlikely. Today logs are transported by truck.
The declining need to use rivers for commercial logging coincides with changing attitudes toward the preservation of our natural resources. Rivers, long-recognized as unique natural resources, are no longer primarily subjects of commercial exploitation and gain but instead are valued in their own right as a means of travel. Indeed, the Legislature has enacted a system to designate rivers either “wild, scenic [or] recreational” in order to protect their “historic, ecological and recreational values” (see, ECL 15-2701). In line with these modern circumstances and our precedents, we are satisfied that recreational use should be part of the navigability analysis.
Appellant’s fear that consideration of recreational use unduly broadens the common-law standard and threatens private property rights is unfounded. We do not broaden the standard for navigability-in-fact, but merely recognize that recreational use fits within it. Many cases, including Morgan v King, support the view that a river navigable by small boat, raft or skiff *604 is subject to the public easement (see, e.g., People ex rel. Lehigh Val. Ry. Co. v State Tax Commn., 247 NY 9, 11 [“(m)otor boats, row boats, rafts and skiffs”]; People ex rel. Erie R. R. Co. v State Tax Commn., 266 App Div 452, 454 [“rowboats and canoes”], affd 293 NY 900; People ex rel. New York Cent. R. R. Co. v State Tax Commn., 258 App Div 356, 360 [“small boats” and “rafts”], affd 284 NY 616; see also, Morgan v King, supra, 35 NY, at 458 [single logs]). Morgan did not limit the common-law rule, but expanded it to include mill-logs. Here, we recognize what was assumed in Morgan — that boaters can make use of the common-law easement. We only hold that such transport need not be limited to moving goods in commerce, but can include some recreational uses. Practical utility for travel or transport nevertheless remains the standard.
Furthermore, property rights are not materially altered by this holding. Riparian owners retain their full panoply of rights, subject only to the long-recognized navigational servitude. As we emphasized in Smith v Odell (234 NY 267, 272), and reiterated in Douglaston Manor v Bahrakis (supra, 89 NY2d, at 481):
“[T]here is no necessary conflict between the reservation to the public of the right of navigation and the recognition of the exclusive privilege expressly granted to the owner. The public right, whatever it might otherwise be, must be held limited in such a situation to the right to use the waters for the purposes of a public highway. * * * [T]he easement of passage over navigable waters does not involve a surrender of other privileges which are capable of enjoyment without interference with the navigator.”
Having never owned the easement, riparian owners cannot complain that this rule works a taking for public use without compensation (see, Morgan v King, supra, 35 NY, at 457-458; see also, Soon Duck Kim v City of New York, 90 NY2d 1, 6-7; Matter of Gazza v New York State Dept. of Envtl. Conservation, 89 NY2d 603, 613-614; Lucas v South Carolina Coastal Council, 505 US 1003, 1027).
IL
Even if recreational use can be considered in addition to commercial use, a conclusion we now endorse, ALC nonetheless argues that questions of fact persist regarding the South *605 Branch’s capacity for such uses. Although the question of navigability can in some circumstances be decided as a matter of law (see, e.g., Morgan v King, supra), on the record before us we agree with ALC that the remedy of summary judgment is inappropriate (see, Andre v Pomeroy, 35 NY2d 361, 364).
In reaching this conclusion, we do not rely on the fact that both sides reach different conclusions on the ultimate question of navigability. Navigability turns on evidence of actual practical use or evidence of capacity for practical use. There may be experts in geology, hydrology, economics, fluvial geomorphology,* and even expert canoers and river guides, among others, who can provide evidence of actual use or evidence of the river’s capacity, but the ultimate conclusion — navigability-in-fact—in this case, is for the trier of fact based on the evidence.
Accépting the truth of the data in ALC’s affidavits (see, Patrolmen’s Benevolent Assn. v City of New York, 27 NY2d 410, 415), we are unable to conclude, as a matter of law, that the historical log drives on the South Branch were not accomplished by use of dams and other artificial augmentation of the river flow. Central to this Court’s holding in Morgan was the fact that the portion of the Raquette River there held to be nonnavigable could be used for logging only with the aid of artificial improvements (Morgan v King, supra, at 460). The standard requires that navigability be determined by the river “in its natural state and its ordinary volume” (id., at 459). Moreover, it is not necessary that the stream
“be capable of being * * * navigated, against its current * * *. Nor is it essential to the easement, that the capacity of the stream, * * * should be continuous, or, in other words, that its ordinary state, at all seasons of the year, should be such as to make it navigable. If it is ordinarily subject to periodical fluctuations in the volume and height of its water, attributable to natural causes, and recurring as regularly as the seasons, and if its periods of high water or navigable capacity, ordinarily, continue a sufficient length of time to make it useful as a highway, it is subject to the public easement” (id., at 459).
Thus, in Morgan, the Raquette River could not be considered *606 navigable-in-fact given that, even with the utilization of dams and teams of loggers, the river was usable for less than two months (id., at 459).
Here, the parties have offered conflicting evidence concerning whether the South Branch was able to be used for logging without artificial augmentation. Plaintiff has submitted photographs of the remnants of many dams, three of which are in the South Branch itself, as well as flow data and historical accounts of logging on the river in support of its claim that artificial means were necessary to render the South Branch capable of commercial use. Plaintiff also proffers the affidavit of its historian, who, on review of various historical documents and from interviewing individuals connected with the logging industry, concluded that logging was only accomplished through an extensive system of impounding dams and the use of tremendous manpower. Moreover, the historian also indicated that the log drives lasted only a short time, often less than two weeks.
Yet, none of the evidence on which the historian relies is conclusive. Although dams may have been used, it is not clear from the documents whether dams were essential. The use of dams may have only increased what was already a sufficient flow in the South Branch. It also remains unclear whether it was the capacity of the South Branch or the logging company’s own time frame which set the length of time of the logging drives.
Defendants rely on the fact that ALC’s contracts for use of the South Branch for logging with the Gould Paper Company from 1926 to 1948 prohibited the construction of dams for use in logging. The contracts state that Gould Paper “will not build any dam or place any obstruction in said portion of the south branch of the Moose River or in any way interfere with the natural flow thereof.” Although defendants offer evidence of ALC’s scrupulous monitoring of its contracts, when and if dams were built and the necessity of their use cannot be determined from the record before us. Contrary to the dissent, the parties’ submissions fail to compel a conclusion that practical, commercial use of the South Branch occurred in its “natural state and its ordinary volume.”
Similarly, the evidence of recreational use does not compel the conclusion that substantially unobstructed travel on the South Branch can occur periodically or seasonally (see, Morgan v King, supra, at 459). Defendants are correct, however, that *607 the existence of occasional natural obstructions do not destroy the navigability of a river (People ex rel. Erie R. R. Co. v State Tax Commn., 266 App Div 452, 454, supra; New York Power & Light Corp. v State of New York, 230 App Div 338, 342 [riffs and shallows do not effect river’s general navigable character]; Frazee Milling Co. v State of New York, 122 Misc 545, 547 [rapids or obstructions]; see also, Matter of Niagara Falls Power Co. v Water Power & Control Commn., 267 NY 265, 270; Danes v State of New York, 219 NY 67, 71 [dicta]; Sawczyk v United States Coast Guard, 499 F Supp 1034, 1039 [WD NY]). Following naturally from this proposition is that in order to circumvent these occasional obstacles, the right to navigate carries with it the incidental privilege to make use, when absolutely necessary, of the bed and banks, including the right to portage on riparian lands (People ex rel. Erie R. R. Co. v State Tax Commn., supra, at 454; People v Kraemer, 7 Misc 2d 373, 383-384, corollary proceeding sub nom. Matter of Kraemer v County Ct., 7 AD2d 644, affd 6 NY2d 363; see also, Restatement [Second] of Torts § 193, comment d). On the other hand, any use of private river beds or banks that is not strictly incidental to the right to navigate gives rise to an action for trespass (cf., Brewster v Rogers Co., 169 NY 73, 78).
The individual defendants’ trip down the South Branch is evidence of navigability, but that event is not enough to demonstrate that the river periodically has sufficient natural volume for a sufficient portion of the year to make it useful as a means for transportation (see, Morgan v King, supra, 35 NY, at 459). The record contains conflicting or inconclusive evidence regarding the river’s ability to sustain commercial boating or canoeing operations or its capacity to float individual canoeing excursions for any given period or season.
For example, the parties proffer evidence of the river’s capacity to sustain commercial whitewater rafting or canoeing ventures. Although a biologist and an economist retained by defendants aver that the river would have utility for such commercial undertakings, the river guide retained by plaintiffs opined that because of the unpredictability of water flow the South Branch provides no commercial value for such ventures. This evidence along with the proffered water flow data is simply inconclusive as to the river’s seasonal or periodic capacity.
The record thus presents issues of material fact that must be determined in a plenary trial, and that are not ripe for summary judgment.
*608 IIL
The final point ALC raises regards collateral estoppel. It claims that a 1948 decision of the Board of the Black River Regulating District that determined that the South Branch of the Moose River was not navigable precludes relitigation of this issue by some parties to the current action. Although that decision was confirmed in a CPLR article 78 proceeding at the Appellate Division (Matter of Adirondack League Club v Board of Black Riv. Regulating Dist., 275 App Div 618), shortly thereafter the Legislature passed an act that prohibited the building of the dám that was the subject of the proceeding. On appeal to this Court, we noted that the legislative act had mooted the case, but since a dismissal of the appeal would have left the decision of the Appellate Division intact as precedent, we remitted with directions to dismiss the petitions on mootness grounds (301 NY 219, 222-223). In such instance, no party is collaterally estopped from litigating the issue of the navigability of the South Branch of the Moose River on the basis of that prior determination.
Accordingly, the judgment of Supreme Court and the order of the Appellate Division brought up for review should be modified, without costs, by denying defendants’ motions for summary judgment and, as so modified, affirmed.

 Fluvial geomorphology is the science of the nature of rivers, their hydrology, hydraulics; and geology.