Rose, J.
(dissenting). In our view, the Mud Pond Waterway (hereinafter the Waterway) does not meet the navigable-in-fact test under common law and, therefore, we respectfully dissent. The Waterway is defined by the parties to include the Narrows *32 of Lilypad Pond, Mud Pond, the Mud Pond Outlet Rapids, the Mud Pond Outlet Brook and the Shingle Shanty Brook from the junction of the Mud Pond Outlet Brook until it reaches publicly-owned land. Mud Pond itself is shallow and narrow, and the rapids at the outlet are approximately 500 feet in length. Given the rocky terrain and shallowness of the water, the rapids are impassable, even by canoe. The Mud Pond Outlet Brook and Shingle Shanty Brook are so narrow in spots that a rowboat cannot navigate them because its oars will hit the banks, and the water course meanders, twists and turns back upon itself, with beaver dams, downed trees and dense vegetation growing out from the banks and up from the bed. It is only through plaintiffs’ efforts that the Waterway is cleared of natural debris that would otherwise render it impassable.
There is no dispute that the land encompassing the Waterway, referred to by the parties as the Mud Pond parcel, is privately owned, with plaintiffs’ ownership and right to use the Waterway dating to 1851. Historically, the land bordering the Mud Pond parcel to the north was also privately owned, but defendant State of New York acquired neighboring Lake Lila in 1979 and the Whitney Wilderness Area, including Little Tupper Lake, in 1998. The State then opened these areas to the public and, as a result, the public may now canoe on what is known as the Lila Traverse, a series of lakes, ponds, streams and portages by which one can travel from Little Tupper Lake to Lake Lila. Defendants do not dispute that it is only as a result of the State’s recent acquisitions that the Waterway may be accessed from publicly-owned land and that, but for the short portage around the rapids, those members of the public engaged in the sport of wilderness canoeing are now able to reach the Waterway and navigate its meandering path, whereas they previously had no way of accessing it. The majority relies on this public access and ability to travel by canoe through the Waterway, as well as plaintiffs’ own use of the Waterway to hunt, trap and bring supplies to construct and maintain their hunting camp located on the Mud Pond parcel, as proof of the Waterway’s capacity for travel or transport and, thus, its navigability. In our view, however, the evidence regarding the location of the Waterway and its history of use establishes that it is not of such practical usefulness to the general public as a means of travel or transport that it can be said to meet the navigable-in-fact standard.
The common law of New York provides that bodies of water may be privately owned by the riparian owners (see Smith v *33 City of Rochester, 92 NY 463, 473-474 [1883]). A public easement over privately-owned lakes and streams will be recognized only if the body of water satisfies the navigable-in-fact standard (see Douglaston Manor v Bahrakis, 89 NY2d 472, 479 [1997]). New York’s navigable-in-fact doctrine is rooted in the public’s use of waterways as a common public highway for transporting people or goods (see Van Cortlandt v New York Cent. R.R. Co., 265 NY 249, 254-255 [1934]; Morgan v King, 35 NY 454, 458 [1866]; Waterford Elec. Light, Heat & Power Co. v State of New York, 208 App Div 273, 277 [1924], affd 239 NY 629 [1925]; see also People v Platt, 17 Johns 195, 209-211 [1819]), and it “recognizes that some waterways are of such practical utility that private ownership from the time of the original grant from the State or sovereign is subject to an easement for public travel” (Adirondack League Club v Sierra Club, 92 NY2d 591, 601 [1998]; see also Navigation Law § 2 [5]). Traditionally, “a waterway is navigable in fact only when it is used, or susceptible of being used, in its natural and ordinary condition, as a highway for commerce over which trade and travel are or may be conducted in the customary modes of trade and travel on water” (Fairchild v Kraemer, 11 AD2d 232, 235 [1960], citing The Daniel Ball, 77 US 557, 563 [1870]). While the Court of Appeals has made clear that the ability to support recreation is a factor for consideration in determining navigability (see Adirondack League Club v Sierra Club, 92 NY2d at 603), “recreational use alone is insufficient to establish that a body of water is navigable!-]in[-]fact” (Dale v Chisholm, 67 AD3d 626, 627 [2009]; compare Arkansas Riv. Rights Comm. v Echubby Lake Hunting Club, 83 Ark App 276, 286, 126 SW3d 738, 744 [2003]; Matter of Adjudication of the Existing Rights to the Use of All the Water, 311 Mont 327, 340, 55 P3d 396, 404 [2002] [examples of jurisdictions where the law has developed differently than it has in New York, and navigability may be established by recreational use alone]). The Court of Appeals in Adirondack League Club explicitly held that the recognition that recreational uses may be considered in determining navigability did “not broaden the standard for navigability-in-fact,” and the standard remains “ [practical utility for travel or transport” (Adirondack League Club v Sierra Club, 92 NY2d at 603-604).
Defendants argue that the Waterway is now part of the Lila Traverse, although the Traverse was originally laid out by de *34 fendant Department of Environmental Conservation (hereinafter DEC) to avoid any encroachment on private property. As defendants now depict it, the Lila Traverse begins at the public access point on Little Tupper Lake with a 4.19-mile paddle across the lake, followed by an additional 1.3 miles by water to the first portage of .1 miles. From there, travel by water for another 1.18 miles on Rock Pond is possible until the next portage, which is 1.75 miles to Hardigan Pond. This portage has been described as difficult, with the path oftentimes submerged or muddy. The water travel on Hardigan Pond is .61 miles, followed by another portage of .4 miles to the Salmon Lake Outlet. From there, water travel of .92 miles on the Salmon Lake Outlet followed by .36 miles on the Little Salmon Lake leads to another portage of .4 miles to Lilypad Pond, which then feeds into the Narrows where the water crosses the property line and leads to the privately owned Mud Pond, allowing for one mile of water travel over plaintiffs’ private property before reaching the Mud Pond Outlet Rapids. A short portage around the Mud Pond Rapids is required before following the Mud Pond Outlet to the Shingle Shanty Brook for 1.28 miles until it exits plaintiffs’ property and reenters the publicly-owned Whitney Wilderness Area. From there, the public-owned portion of Shingle Shanty Brook leads for 2.14 miles to publicly-owned Lake Lila, which requires another 2.14 miles of water travel to the public beach. Yet another .3-mile portage is required to the nearest publicly accessible road, which is only open seasonally. This trip may be done in reverse, which of course would be required in the absence of having a mode of transportation at both access points. The Lila Traverse as described covers two watersheds and, although the Waterway flows downstream from Salmon Lake via the Salmon Lake Outlet, that lake is still privately owned and thus does not serve as a public access point to the Waterway.
As described, defendant Phil Brown took the route from Little Tupper Lake to Lake Lila over the course of two days in May 2009, with another individual meeting him with a vehicle parked near Lake Lila.[1] There is no dispute that Brown could have remained on State land during his trip by taking the publicly-owned and DEC-maintained portage trail of .77 miles *35 from Lilypad Pond to the Shingle Shanty Brook.[2] The Lila Traverse over publicly-owned lands covers a total of 16.58 miles, including both the water travel and portages. The distance traveling the Lila Traverse via the privately-owned Waterway is 17.86 miles. Inasmuch as the adjoining Whitney Wilderness Area did not become open to the public until after the State’s multimillion dollar purchase in 1998, there is limited history of the public making the Lila Traverse by using the Waterway.[3] Those members of the public who do so must necessarily be canoers who are physically fit and equipped with the necessary gear to paddle and portage through the remote backcountry over the course of multiple days.
While the majority correctly states that a body of water with no inlet, outlet or public access is not navigable-in-fact (see e.g. Dale v Chisholm, 67 AD3d at 627; Mohawk Val. Ski Club v Town of Duanesburg, 304 AD2d 881, 883-884 [2003], abrogated on other grounds Town of N. Elba v Grimditch, 98 AD3d 183 [2012]; Hanigan v State of New York, 213 AD2d 80, 84 [1995]), it seems clear enough to us that the converse of this statement is not true (see e.g. Morgan v King, 35 NY at 460 [portion of Raquette River in question not navigable despite the ability of the public to access it from either end]). While the lack of any public access is determinative, the mere existence of access is not. The majority’s reliance on the existence of two public access points from Lake Lila and Little Tupper Lake, both of which are unpopulated, as proof sustaining navigability, overlooks the distance from these access points to the Waterway and the effort required to reach it. Given the Waterway’s remote nature and the number and length of the carries required to reach it, only a strained reading of the navigability standard would suggest that these two access points are enough to give it any practical utility for common usage as a public highway for travel or transport.
In addition to limited access, the record makes clear that the capacity of the Waterway is limited to canoes. However, to conclude that the ability to canoe it is evidence of its capacity for travel or transport ignores the practical utility aspect of the standard required to find a public easement. While the ability *36 of backcountry paddlers to canoe the Waterway is certainly a factor to be considered, it cannot be viewed in isolation or accorded undue weight in determining navigability. Indeed, the evidence in Morgan established that logs were capable of being floated through the privately owned portion of the Raquette River in question. Nevertheless, the available season only lasted two months, workers were required to aid the passage of the logs and the resulting damage to the logs caused by the rapids and rocks led to the conclusion that “[i]t would be going beyond the warrant of either principle or precedent to hold that a floatable capacity, so temporary, precarious and unprofitable, constituted the stream a public highway” (Morgan v King, 35 NY at 460). In Adirondack League Club, factual issues were found regarding navigability despite the fact that commercial activity had indisputably occurred on the South Branch of the Moose River (Adirondack League Club v Sierra Club, 92 NY2d at 602).[4] Although a waterway may be capable of supporting limited activity, it may nevertheless be considered nonnavigable (see Morgan v King, 35 NY at 460; see also Meyer v Phillips, 97 NY 485, 490 [1884] [five-mile stream, of which two miles were privately owned, deemed nonnavigable given the infrequency of use by a “limited number of persons”]; Munson v Hungerford, 6 Barb 265, 270 [1849] [in order to be navigable, stream “must be of common or public use for carriage of boats and lighters”[5]]; People v Platt, 17 Johns at 212-213 [Saranac River nonnavigable despite fact that rafts “have occasionally been brought down”]). The Waterway likewise does not meet the navigability standard in that, while it is capable of being used for the recreational activity of wilderness canoeing, and such canoers have in fact begun to use it, it has no practical utility to be commonly used by the general public for travel or transport.
Nor are we persuaded by the majority’s reliance on People ex rel. Lehigh Val. Ry Co. v State Tax Commn. (247 NY 9, 11-12 [1928]) and People ex rel. New York Cent. R.R. Co. v State Tax Commn. (238 App Div 267, 268 [1933], affd 268 NY 519 [1935]) for the proposition that narrow, shallow streams may be *37 considered navigable. Those cases differ materially from this one. At issue in Lehigh Val. Ry Co. were the Cascadilla and Six Mile Creeks, both of which, as reflected by the decisions and the materials in the record, are located in the populated City of Ithaca, Tompkins County, where they lead directly into Cayuga Lake. At issue in New York Cent. R.R. Co. was Roeliff Jansen’s Kill located in the Town of Livingston, Columbia County, where the tide ebbed and flowed and there was a history of “considerable commercial transportation and navigation” (People ex rel. New York Cent. R.R. Co. v State Tax Commn., 238 App Div at 268). Thus, although Cascadilla Creek, Six Mile Creek and the relevant portion of Roeliff Jansen’s Kill may all be shallow and narrow streams accommodating only small-size craft, there is a distinct and telling difference between them and the Waterway. Given the latter’s limited use and remote location far from any population centers or arteries of commerce, it has no practical utility to the general public. To conclude that such a remote and narrow stream may be navigable-in-fact without consideration of this broader context reduces the navigability test to an improper one of mere access and floatability — i.e., as long as any member of the public can successfully travel by canoe on the stream in question, the stream has capacity and is navigable.[6] Such a result does not adhere to the common-law standard.
Finally, to suggest that the private owners’ personal use of the Waterway reflects a capacity for commercial use also ignores its remote, isolated nature. Notably, based on the Waterway’s narrow, meandering path and impassable rapids, it is incapable of transporting any timber, a traditional test for navigability. Based on the lack of any nearby roads or population centers, and the portages required to reach the Waterway, the only goods that would be transported through it would be for personal use. The proof that plaintiffs’ predecessors allowed individuals to travel through the Waterway for a period of time in the 1800s before closing access to it, and that individual members of plaintiffs used the Waterway for hunting, trapping and carrying supplies to their isolated hunting camp, merely reflects their private property rights in the Waterway and does not establish any practical utility to the general public for *38 travel or transport. Nor does the fact that a backcountry guide may propose to take canoeists through the Waterway if it were to be adjudicated as navigable prove the Waterway’s capacity for common use by the general public.
In summary, we cannot agree that the feasibility of using the Waterway for recreation and the fact that the public is capable of reaching it through a series of lakes, ponds, streams and portages render it a practical means of transportation so as to be navigable-in-fact. To conclude that they do would, in our view, unnecessarily expand our navigability-in-fact doctrine and destabilize settled expectations of private property ownership by opening up remote, unpopulated, privately owned bodies of water as long as the public has some way, however arduous and recently acquired, of gaining access to them.
Peters, P.J., and Lynch, J., concur with Garry, J.; Rose, J., dissents in a separate opinion in which Lahtinen, J., concurs.
Ordered that the order and judgment are affirmed, without costs.

. At the time of Brown’s trip, the seasonal road had not been opened, requiring him to leave his gear on the shore of the lake and hike 4V2 miles to the nearest county road. A helpful road crew then assisted him in retrieving his gear.

. DEC built this trail in apparent recognition of plaintiffs’ private property rights.

. Prior to Brown’s publicized trip, any wilderness canoers wishing to make the Lake Lila Traverse who referred to the DEC’s trail guide were directed to take the route that remained on publicly-owned land.

. The settlement ultimately reached by the parties in Adirondack League Club provides less access for the public than will be available under the majority’s holding in this case (see South Branch Moose River Settlement, www.dec.ny.gov/docs/lands_ forests_pdFmrpwfump019.pdf).

. A lighter is “a large, open, flat-bottomed barge, used in unloading and loading ships offshore or in transporting goods for short distances in shallow waters” (Random House Webster’s Unabridged Dictionary [2d ed 2001]).

. This improper standard for navigability is reflected in the majority’s reference to the DEC officials’ opinion that the Waterway is navigable-in-fact based on their ability to travel through it. DEC took a similarly incorrect position in Hanigan v State of New York (213 AD2d at 82).