OPINION OF THE COURT
Ciparick, J.
In 1990, the City of New York regraded a public road in Queens. To maintain lateral support between the road and plaintiffs’ property, the City placed side fill on the portion of plaintiffs’ property abutting the roadway. In this lawsuit, plaintiffs contend that they are entitled to compensation for the portion of their property taken by the City. We disagree.
Plaintiffs acquired their property with constructive notice that the property abutted a public road that was below the legal grade. In regrading the road and raising a portion of *4 plaintiffs’ property up to the legal grade, the City acted pursuant to a long-standing common-law principle and in conformity with a provision of its Charter that was in force when plaintiffs acquired title to their property. Therefore, we conclude that the City did not take any property interest from plaintiffs for which compensation is due.
I.
In June 1978, the now-defunct New York City Board of Estimate raised the legal grade of a section of College Point Boulevard in Queens from 9.1 to 13.5 feet. In October 1978, a map reflecting that legal grade was properly filed in the office of the Queens Borough President. Ten years later, plaintiffs purchased a parcel of property on College Point Boulevard, on which they currently operate a car wash and lease space to an auto repair shop. When plaintiffs purchased the property, the grade of their parcel was more than four feet below the legal grade. Plaintiffs had constructive notice of this feature by virtue of the filed map.
As part of a public construction project on College Point Boulevard in 1990, the City undertook to raise the roadway to its legal grade. In March of that year, the City’s Department of Transportation gave plaintiffs written notice of the plan to raise College Point Boulevard to the previously established legal grade and advised plaintiffs of their obligation under the City Charter to raise their property to the legal grade (see, NY City Charter § 2904 [2]). The notice informed plaintiffs that the City would regrade the property at no cost to them upon receiving their consent within 10 days, but that if consent was not timely received, the City was authorized to do the work itself and seek reimbursement for its cost from plaintiffs. Plaintiffs failed to respond to the notice.
The City regraded the relevant portion of College Point Boulevard in June 1990. On account of the nearly five-foot disparity between the legal grade of College Point Boulevard and the lower grade of plaintiffs’ property, the Department of Transportation raised plaintiffs’ property to the legal grade by placing side fill on 2,390 square feet of plaintiffs’ property abutting the public roadway. It is undisputed that the side fill was necessary to support the street and prevent erosion.
Plaintiffs had previously commenced this action in March 1990, alleging, among other things, that the City’s regrading project would work an unconstitutional taking of their prop *5 erty without just compensation.[1] Plaintiffs moved and the City cross-moved for summary judgment on the takings claim. Supreme Court denied plaintiffs’ motion and granted the City’s cross motion, concluding that because the City was authorized by New York City Charter § 2904 to compel plaintiffs to raise their property to the legal grade, no taking had occurred. The Appellate Division affirmed. After the parties stipulated to discontinue all causes of action other than the takings claim, we granted leave to appeal and now affirm.
II.
Plaintiffs contend that the City’s action in placing side fill on almost 2,400 square feet of their property constitutes an unconstitutional taking of a portion of their property without just compensation. In support of this contention, plaintiffs invoke the rule that any government-authorized "permanent physical occupation” of property is a taking, no matter how small the area occupied and without regard to the public interest served by the government’s action (with the magnitude of the occupation factoring only into the amount of compensation due) (see, Loretto v Teleprompter Manhattan CATV Corp., 458 US 419, 426-428). If this case involved simply the City’s dumping of side fill on 2,400 square feet of plaintiffs’ property, we might well agree with plaintiffs and the dissent, and conclude that there was a taking (see, Pumpelly v Green Bay Co., 13 Wall [80 US] 166, 181 [taking found where water overflow from dam permanently flooded landowner’s property]; Matter of Cheesebrough, 78 NY 232, 238 [taking found where City constructed permanent drain on landowner’s property]; but cf., Loretto v Teleprompter Manhattan CATV Corp., supra, 458 US, at 440, n 19). However, that is not this case. We conclude instead that, by virtue of the common-law and City Charter obligation of lateral support to a public roadway, plaintiffs’ title never encompassed the property interest they claim, has been taken.
Central to the analysis of the issue on appeal is the settled proposition that "[p]roperty interests * * * are not created by the Constitution. Rather, they are created and their dimen *6 sions are defined by existing rules or understandings that stem from an independent source such as state law” (Board of Regents v Roth, 408 US 564, 577). Because the State defines the rights and obligations that constitute "property” in the absence.of any superseding Federal law, the threshold step in a takings inquiry is to determine whether, in light of the " 'existing rules or understandings’ ” of State law, plaintiffs ever possessed the property interest they now claim has been taken by the challenged governmental action (Lucas v South Carolina Coastal Council, 505 US 1003, 1030 [quoting Board of Regents v Roth, supra, 408 US, at 577]). As explained by the Supreme Court in Lucas, the purpose of this "logically antecedent inquiry into the nature of the owner’s estate” is to determine whether the allegedly taken property interest was a stick in the "bundle of property rights” acquired by the owner (505 US, at 1027, supra). Only if the claimed property interest inhered in the owner’s title does the court proceed to determine whether the challenged governmental action works a compensable taking of that property interest (see, e.g., Penn Cent. Transp. Co. v New York City, 438 US 104, 123-125).
A threshold inquiry into an owner’s title is generally necessary to the proper analysis of a takings case, whether of a regulatory or physical nature (see, Lucas v South Carolina Coastal Council, supra, 505 US, at 1028-1029 ["Where 'permanent physical occupation’ of land is concerned, we have refused to allow the government to decree it anew (without compensation), no matter how weighty the asserted 'public interests’ involved, Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S., at 426 — though we assuredly would permit the government to assert a permanent easement that was a pre-existing limitation upon the landowner’s title”]). Thus, regardless of whether this case is characterized as a physical or regulatory taking, a question we do not reach,[2] our analysis starts with a search into the bundle of rights and concomitant obligations contained in plaintiffs’ title.
*7 It has been suggested that this "logically antecedent inquiry” into the owner’s title should be limited to a review of those property and nuisance rules recognized at common law, and that statutory law should not factor into the analysis (see, e.g., K & K Constr. v Department of Natural Resources, 217 Mich App 56, 63-64, 551 NW2d 413, 417-418; Kmiec, At Last, the Supreme Court Solves the Takings Puzzle, in Callies [editor], Takings: Land-Development Conditions and Regulatory Takings After Dolan and Lucas, at 110-112). Some, confusion in this respect stems from the Supreme Court’s emphasis on the nuisance doctrine in Lucas to illustrate the type of background restriction of State law that would inhere in a property owner’s title (see, e.g., Lucas v South Carolina Coastal Council, supra, 505 US, at 1029 [property owner’s title contains the restrictions on use that "could have been achieved in the courts * * * under the State’s law of private nuisance, or by the State under its complementary power to abate nuisances that affect the public generally”]). However, we do not think that this aspect of the Lucas opinion should be read so narrowly.
Given the theoretical basis of the logically antecedent inquiry — namely, "the State’s power over * * * the 'bundle of rights’ that [property owners] acquire when they obtain title” (Lucas v South Carolina Coastal Council, supra, 505 US, at 1027) — we can discern no sound reason to isolate the inquiry to some arbitrary earlier time in the evolution of the common law. It would be an illogical and incomplete inquiry if the courts were to look exclusively to common-law principles to identify the preexisting rules of State property law, while ignoring statutory law in force when the owner acquired title (accord, Hunziker v State, 519 NW2d 367, 371 [Iowa] [no taking when statutory restriction on use of land was in effect when plaintiffs acquired title], cert denied 514 US 1003; Grant v South Carolina Coastal Council, 319 SC 348, 353-354, 461 SE2d 388, 391 [same]). To accept this proposition would elevate common law over statutory law, and would represent a departure from the established understanding that statutory law may trump an inconsistent principle of the common law (see, e.g., Gombert v McKay, 201 NY 27, 30). As the Supreme Court has aptly observed:
"A person has no property, no vested interest, in any rule of the common law. That is only one of *8 the forms of municipal law, and is no more sacred than any other. Rights of property which have been created by the common law cannot be taken away without due process; but the law itself * * * may be changed at the will, or even at the whim, of the legislature, unless prevented by constitutional limitations. Indeed, the great office of statutes is to remedy defects in the common law as they are developed, and to adapt it to the changes of time and circumstances” (Munn v Illinois, 94 US 113, 134).
The corpus juris of this State comprises constitutional law, statutory law and common law. To the extent that each of these sources establishes binding rules of property law, each plays a role in defining the rights and restrictions contained in a property owner’s title. Therefore, in identifying the background rules of State property law that inhere in an owner’s title, a court should look to the law in force, whatever its source, when the owner acquired the property (see, Matter of Gazza v New York State Dept. of Envtl. Conservation, 89 NY2d 603 [decided today] [enforcement of preexisting statutory wetlands restriction not a taking]; Matter of Anello v Zoning Bd. of Appeals, 89 NY2d 535 [decided today] [enforcement of preexisting steep-slope ordinance not a taking]).[3] In this case, we find applicable rules in the common law and in New York City’s Charter.
*9 III.
Plaintiffs’ obligation to preserve and maintain the legal grade has its roots in New York’s common-law obligation of lateral support. In Village of Haverstraw v Eckerson (192 NY 54), the Court discussed this obligation and distinguished between the lateral-support obligations of adjoining private landowners and the lateral-support obligation of a private landowner abutting a public roadway, noting that the landowner’s duty with respect to the public roadway "will be somewhat broader” than the duty owed to an adjoining private landowner; indeed, the obligation was said to run in only one direction — "the municipality is not under a similar obligation to the abutting owner” (id., at 59).[4] Elaborating on the broad scope of this duty, the Court explained that "the preservation of lateral support to a highway, as constructed and prepared for the public use, is an obligation to the community, which rests upon the adjacent landowner. It is an absolute right of the public, in the maintenance of which the members of the community are concerned” (id., at 59; see also, 1 Rasch, New York Law and Practice of Real Property § 20:23, at 616 [2d ed] ["the fee owner of land abutting on a highway is under an obligation to preserve the lateral support to a public highway”]).
The dissent’s reliance on authorities discussing the separate and narrower obligation owed to a neighboring private landowner is misplaced (see, dissenting opn, at 22 [citing Restatement (Second) of Torts § 817; 1 Am Jur 2d, Adjoining Landowners, § 40]). For example, the rule that the obligation of lateral support only prohibits "the withdrawal of the support of any land naturally necessary to maintain another’s land in its natural condition” (dissenting opn, at 22) does not apply when a public roadway is involved. As explained in one treatise: "An exception to the general rule that the absolute right to support extends only to the land in its natural state occurs when the supported land is an adjacent public highway. The duty to provide lateral support includes the duty to support *10 the highway in its improved condition. The courts have held that the public interest in highways justifies the enlargement in the scope of duty” (9 Powell, Real Property 699 [1], at 63-6 [emphasis added]).
Nevertheless, we need not define the precise contours of the common-law duty in this case, because the property owner’s obligation of lateral support to a public roadway finds its specific, contemporary formulation in the New York City Charter, which provides:
"The owner of any property at his own cost, shall * * * fill any sunken lot or lots comprising part or all of such property or cut down any raised lot or lots comprising part or all of such property whenever the transportation department shall so order pursuant to standards and policies of the transportation department * * *. In the event that the owner fails to comply with the provisions of this section, the transportation department may provide for the doing of same at the expense of the owner in the manner to be provided by local law” (NY City Charter § 2904 [2]; see, L 1992, ch 813, § 2).
Under this section, the property owner’s obligation to "fill any sunken lot” is juxtaposed with the related obligation to "cut down any raised lot” (NY City Charter § 2904 [2]). Together, these provisions embody the rule that the landowner must, maintain lateral support to the roadway. According to the dissent, however, property can only be considered "sunken” when "something has happened to the lot in question which might * * * require repair,” and, therefore, a property owner’s City Charter obligation to raise the property is not triggered "when it is the City that has caused the disparity.” (Dissenting opn, at 21, 23.) We do not construe the statute so narrowly and conclude that section 2904 applies to this case because the City raised the roadway up to the legal grade that was established before plaintiffs acquired their property.
While acknowledging that one accepted meaning of the term " 'sunken’ ” is " 'situated or lying on a lower level,’ ” the dissent contends that section 2904 contemplates only the "primary meanings” of the term, which are " 'having sunk or been sunk beneath the surface’ ” and " 'having sunk to a lower level’ ” (dissenting opn, at 20-21 [quoting Random House Web *11 ster’s College Dictionary 1339 (1991)]).[5] However, in view of its juxtaposition with the term "raised,” we believe the term "sunken” has the more general meaning of "situated or lying on a lower level” (see also, Webster’s New World Dictionary 1427 [2d ed] ["sunken” defined as "below the level of the surrounding or adjoining area”]). This definition, considered in light of the broad common-law obligation of lateral support to a public roadway, supports the conclusion that a "sunken” lot, for purposes of section 2904, is one that is below legal grade. Moreover, this construction best serves the statutory purpose of supporting the roadway and protecting it from erosion, as well as abating the substantial safety hazard posed by drop-offs between the roadway and abutting properties.
The applicability of section 2904’s lateral-support obligation to the facts of this case — where a property owner acquires property on notice of a legal grade different from the existing grade — is illustrated by this Court’s analysis in Laba v Carey (29 NY2d 302, 311-312). In Laba, the Court addressed the marketability of title of a property on which the existing grade of the public sidewalk was lower than the legal grade. Rejecting the purchaser’s argument that this defect rendered title unmarketable, the Court explained in a particularly instructive passage:
"Although there is no present violation, respondents contend that they may be required in the future to raise the level of the sidewalk. This is nothing more than a normal incident to the ownership of real property within the City of New York. Section 230 of the New York City Charter [the predecessor provision to section 2904] places the responsibility for the maintenance and repair of sidewalks on the individual owner. This must be done in accordance with such specifications as may be prescribed by the Transportation Administration. Thus, if title is unmarketable here, then so is all property similarly situated within the city. This is manifestly not so” (29 NY2d, at 312, supra [emphasis added]).
*12 In this case, the City Charter obligation of lateral support to the legal grade of a public roadway — "a normal incident to the ownership of real property within the City of New York” (Laba v Carey, supra, 29 NY2d, at 312) — was in force when plaintiffs bought their property. In addition, plaintiffs acquired their property with constructive notice that the existing grade was below the legal grade, which had been duly established by the filing of a revised city map in accordance with statutory procedure (see, Administrative Code § 25-101 ["The city map is to be deemed final and conclusive with respect to the location, width and grades of the streets shown thereon, so far as such location, width and grades have been duly adopted”]).
Thus, plaintiffs acquired a "sunken lot” insofar as it was below the legal grade of the road and, accordingly, took the property subject to the section 2904 obligation to raise it to the legal grade (see, Trubia v Koch, NYLJ, Aug. 15, 1979, at 13, col 1 [Sup Ct, Queens County], affd 87 AD2d 742).[6] Moreover, plaintiffs were on notice that if they failed to discharge their obligation, the City could perform the work at their expense and on the public’s behalf. Plaintiffs’ deliberate noncompliance with this obligation cannot be converted into their present takings claim (see, Hoeck v City of Portland, 57 F3d 781, 787-788, supra [no taking when City entered plaintiff’s property to demolish abandoned structure: "if Hoeck had obeyed the City’s order to repair the structure * * *, it would not have been necessary for the City to enter his property to enforce its regulations”]).[7]
The thrust of the dissenting opinion is that the City did not meet its burden to demonstrate that City Charter § 2904 ap *13 plies to this case (see, dissenting opn, at 21, 25). Even assuming that plaintiffs demonstrated a prima facie takings claim by showing that the City added side fill to their property, the City clearly discharged its burden to rebut plaintiffs’ case by establishing that, pursuant to section 2904, plaintiffs never owned the property interest they claim was taken (see, Lucas v South Carolina Coastal Council, supra, 505 US, at 1031-1032). The City relied on section 2904 at each phase of this action and brought to each court’s attention the 1979 case of Trubia v Koch, in which Supreme Court held and the Appellate Division affirmed that section 2904 applies when a landowner acquires property that is below the legal grade (see, Trubia v Koch, supra, at 13, col 2 ["Under the statutory authority, instead of placing the fill on petitioners’ property at its own expense, the City could have compelled the petitioners, at their own expense, to fill the property to legal grade”]).
We are mindful of thé concern expressed by the dissent that government might attempt to proffer novel interpretations of State law to justify what would otherwise amount to an unconstitutional taking. To guard against this possibility, the Supreme Court explained that only those rules derived from an "objectively reasonable application” of preexisting State law can be said to inhere in a property owner’s title (see, Lucas v South Carolina Coastal Council, supra, 505 US, at 1032, n 18).[8] Thus, while the dissent might plausibly disagree with the Court’s interpretation of section 2904, its concession that the statute "is amenable to two differing yet reasonable interpretations” (dissenting opn, at 21) forecloses its contention that the application of the statute in this case works a taking of plaintiffs’ property.
Finally, when plaintiffs purchased the property, an inquiry would have revealed the disparity between the existing grade and the previously established legal grade. Plaintiffs’ potential lateral-support obligation, then, presumably would have been factored into the purchase price of the property.[9] Consequently, if plaintiffs were to succeed on their takings claim, they could *14 receive the windfall of initially receiving a reduction in the purchase price on account of this obligation and subsequently receiving compensation when the obligation is enforced. Such a result is inconsistent with the basic purpose of takings law, which is to protect the private landowner from unfair fiscal burdens that should be shared by the public as a whole (see, Armstrong v United States, 364 US 40, 49), not to enrich the landowner at the public’s expense.
In sum, we conclude that the lateral-support obligation imposed on plaintiffs was a prevailing rule of the State’s property law when they acquired their property and, accordingly, encumbered plaintiffs’ title and the constituent bundle of rights. The City’s enforcement of this legal obligation therefore does not constitute a taking of any property interest owned by plaintiffs for which they are entitled to compensation. When plaintiffs acquired title to their property in 1988, they acquired ownership of the entire parcel, including the portion abutting the public roadway, subject to the obligation to maintain lateral support to the roadway’s legal grade. Today, plaintiffs still own the entire parcel, including the portion abutting the roadway, subject to the obligation to maintain lateral support to the roadway’s legal grade. The only difference between then and now is not that a property interest has been taken, but that the preexisting lateral-support obligation has been enforced by the City itself because plaintiffs refused to do so.
Accordingly, the judgment appealed from and order of the Appellate Division brought up for review should be affirmed, with costs.

. Apart from the takings claim, plaintiffs asserted a cause of action against the City for interference with their business and sought to enjoin the City from regrading the road. In addition, plaintiffs asserted a cause of action against the prior owners of the property and the prior owners’ attorneys for fraudulent misrepresentations in connection with the sale of the property. The only cause of action at issue on this appeal is plaintiffs’ takings claim against the City.

. Insofar as plaintiffs’ real grievance is with the City’s regulation requiring the maintenance of lateral support to the roadway, the issue might be characterized as a regulatory rather than a physical taking. Although the City physically placed the side fill on plaintiffs’ property, it did so only after plaintiffs refused to discharge their obligation under the City Charter to do the work (see, NY City Charter § 2904 [2]; accord, Hoeck v City of Portland, 57 F3d 781, 787 [9th Cir] [city’s demolition of structure on plaintiff’s property "was not a physical taking for public use * * *, it was a restriction on the use of the property to maintain an abandoned structure”], cert denied 516 US 1112). Moreover, the property owner, not the City, continues to own the area containing the side fill, and the owner can do whatever it likes *7 to that area as long as lateral support to the roadway is maintained (see, Loretto v Teleprompter Manhattan CATV Corp., supra, 458 US, at 440, and n 19).

. We acknowledge the language in the Supreme Court’s opinion in Nollan v California Coastal Commn. (483 US 825, 833, n 2) indicating that the regulatory restriction in that case did not inhere in the plaintiffs’ title even though plaintiffs had constructive notice of the restriction when they acquired the property. However, we think the Nollan footnote is readily harmonized with the "logically antecedent inquiry” subsequently elucidated in Lucas (see generally, Mandelker, Investment-Backed Expectations in Takings Law, in Takings, op. cit., at 135-138 [concluding that the Nollan footnote should not be understood as prohibiting inquiry into preexisting statutory of regulatory restrictions]). Specifically, the property interest allegedly taken in Nollan was not subject to any preexisting restriction; rather, the case centered on a State agency’s policy of conditioning the grant of building permits on the property owner’s surrender of a public easement over the beachfront property (see, Nollan v California Coastal Commn., supra). Because plaintiffs’ predecessors in interest had neither applied for nor been granted the conditioned permit, the government’s interest in the easement was, at the time of plaintiffs’ acquisition of the property, a mere "unilateral claim of entitlement,” not an-enforceable property interest (id., at 833, n 2 [emphasis added]). There was simply no existing title restriction which a purchaser took subject to in that case. We believe that a different situation would have been presented in Nollan, and a different result compelled under Lucas’s "logically antecedent inquiry,” if the property was already subject to a conditioned permit when plaintiffs acquired it.

. Under current law, the City provides a limited claims procedure for actual physical damage caused by its regrading projects (see, Administrative Code of City of NY §§ 3-316 — 3-320). Specifically, recovery is limited to change-of-grade damages to preexisting buildings or improvements (see, Administrative Code § 3-318 [a]). In March 1991, plaintiffs filed a notice of claim with the City pursuant to this provision, the outcome of which is not contained in the record. Nevertheless, insofar as the issue on appeal relates to the separate question of lateral support, which is addressed elsewhere in the City Charter and Administrative Code, this claims procedure is inapposite.

. We note that another dictionary first defines "sunken” as "submerged, especially]: lying at the bottom of a body of water” (see, Merriam-Webster’s Collegiate Dictionary 1180 [10th ed]). Of course, the term "sunken” as used in section 2904 does not mean underwater, but has the meaning that best comports with its statutory context and purpose.

. The dissent’s contention that "an easement on plaintiffs’ property was not created when the City filed the map raising the legal grade of the street” (dissenting opn, at 25) is beside the point since the filing of the revised map "final[ly] and conclusively]” established a higher legal grade (Administrative Code § 25-101). Whether denominated an easement, a servitude or simply a restriction on title, plaintiffs took their property subject to the City Charter obligation requiring lateral support to the previously established legal grade. The dissent’s related assertion that "[u]ntil the City actually raised the grade of the street * * * it would have been impossible to determine the extent” of any taking (dissenting opn, at 25) is similarly misdirected given that plaintiffs’ property interests "are defined by those State laws enacted and in effect at the time [plaintiffs] took title and they are not dependent on the timing of State action pursuant to such laws.” (Matter of Gazza v New York State Dept. of Envtl. Conservation, supra, 89 NY2d, at 616.)

. If plaintiffs had purchased the property at the legal grade, and the City thereafter raised the legal grade of the roadway, a different takings question might be presented.

. Although the Supreme Court made this observation in discussing a court’s application of common-law nuisance doctrine (while disavowing reliance on the Legislature’s stated general justification for newly enacted "confiscatory” laws), this proposition should extend to judicial interpretation of any preexisting State law for the same reasons explained above that the threshold inquiry into title should not be limited to nuisance law.

. Plaintiffs paid $800,000 for the property, and it is unclear whether this purchase price actually included an adjustment for the lateral-support obliga *14 tion. In their complaint, plaintiffs alleged that the prior owners of the property deliberately failed to tell them of the City’s plan to raise the street to its legal grade. Whatever the merits, this sort of claim is properly asserted against other parties to the transaction, not against the City of New York in the guise of a takings claim.