92 N.Y.2d 591 (1998)
706 N.E.2d 1192
684 N.Y.S.2d 168
Adirondack League Club, Inc., Appellant,
v.
Sierra Club et al., Respondents, and State of New York et al., Intervenors-Respondents.
Court of Appeals of the State of New York.
Argued October 22, 1998
Decided December 17, 1998.
Shamberg Marwell Hocherman Davis & Hollis, P. C., Mount Kisco (John S. Marwell, Adam L. Wekstein and Stuart R. Shamberg of counsel), and Bertine, Hufnagel, Headley, Zeltner, Drummond & Dohn, L. P. P., Scarsdale (Peter K. Bertine and Frank M. Headley, Jr., of counsel), for appellant.
Whiteman Osterman & Hanna, Albany (Philip H. Gitlen and Michael G. Sterthous of counsel), for Sierra Club and another, respondents.
Proskauer Rose, L. L. P., New York City (Robert J. Kafin of counsel), and Bartle, McGrane, Duffy & Jones, Troy (Nancy E. Jones of counsel), for Robert Wolfe and others, respondents.
Dennis C. Vacco, Attorney-General, Albany (William S. Helmer, Nancy Spiegel, Roger W. Tippy and Barbara G. Billet of counsel), for State of New York, intervenor-respondent.
John W. Caffry, Inga L. Fricke, Glens Falls and Neil F. Woodworth, Lake George, for Adirondack Mountain Club, Inc., intervenor-respondent.
Phillips, Lytle, Hitchcock, Blaine & Huber, L. L. P., Buffalo (Robert E. Glanville of counsel), for New York Rivers United and others, amici curiae.
Matthew R. Atkinson, White Plains, for Riverkeeper, Inc., amicus curiae.
Bond, Schoeneck & King, L. L. P., Syracuse (H. Dean Heberlig, Jr., of counsel), for Adirondack Landowners Association, amicus curiae.
Hiscock & Barclay, L. L. P., Syracuse (Diane L. Van Epps of counsel), and Jeffery H. Kirby, Glenmont, for New York Farm Bureau, Inc., amicus curiae.
Judges SMITH, WESLEY and DENMAN[*] concur with Judge CIPARICK; Judge BELLACOSA dissents and votes to affirm in a separate opinion; Chief Judge KAYE and Judge LEVINE taking no part.
*600 CIPARICK, J.
This case presents the Court with the opportunity to decide to what extent recreational use can be considered in determining whether a river is navigable-in-fact. The river at issue is the South Branch of the Moose River (the South Branch), 12 miles of which run through property owned by plaintiff Adirondack League Club, Inc. (ALC). On June 15, 1991, the individual defendants traveled down this portion of the South Branch in two canoes and a kayak, an endeavor that required several portages around various obstacles in the river. ALC, a private club, preserves 50,000 acres around this portion of the South Branch for use, including hunting and fishing, by its members. After defendants' trip, ALC sued the Sierra Club, which organized the excursion, and the five individual defendants, some of whom are members of the Sierra Club, for trespass. ALC claims that this section of the South Branch is its private property. Defendants counter that because the South Branch is navigable-in-fact, they were entitled to use the easement reserved to the public in all such waterways. The State of New York and the Adirondack Mountain Club, Inc. intervened as defendants and along with the other defendants moved for summary judgment on the issue of navigability of this portion of the South Branch.
This Court must decide, based on the common-law standard of navigability-in-fact, whether factual questions exist as to the South Branch's navigability. Like the Supreme Court and the two-Justice dissent in the Appellate Division below, we conclude that summary judgment is not warranted. We hold, however, that evidence of the river's capacity for recreational use is in line with the traditional test of navigability, that is, whether a river has a practical utility for trade or travel. Since questions of fact remain regarding whether the South Branch is navigable-in-fact, plaintiff is entitled to have the competing evidence weighed and the credibility of the witnesses assessed at trial. Accordingly, we modify.

*601 I.
The parties differ regarding the type of evidence that will suffice to satisfy the standard of navigability-in-fact. Specifically, the parties differ on the extent to which recreational use should enter into the analysis. Appellant ALC contends that navigability references only commercial utility and that the focus thus should be on the South Branch's use as a logging river during the first half of this century. Reliance on recreational uses, ALC asserts, would disrupt settled expectations regarding private property and would expand the common-law rule beyond its traditional foundation. Defendants argue that recreational and commercial use are both properly part of the analysis.
As a general principle, if a river is not navigable-in-fact, it is the private property of the adjacent landowner. If, however, a river is navigable-in-fact, it is considered a public highway, notwithstanding the fact that its banks and bed are in private hands (Morgan v King, 35 N.Y. 454). This rule is longstanding and recognizes that some waterways are of such practical utility that private ownership from the time of the original grant from the State or sovereign is subject to an easement for public travel (see, id., at 458). Typically, such utility implicated commerce. The seminal case of Morgan v King sets forth the standard for navigability-in-fact:
"[A] river is, in fact, navigable, on which boats, lighters or rafts may be floated to market * * * [Additionally,] the public have a right of way in every stream which is capable, in its natural state and its ordinary volume of water, of transporting, in a condition fit for market, the products of the forests or mines, or of the tillage of the soil upon its banks. It is not essential to the right, that the property to be transported should be carried in vessels, or in some other mode, whereby it can be guided by the agency of man, provided it can, ordinarily, be carried safely, without such guidance * * *. If it is so far navigable or floatable, in its natural state and its ordinary capacity, as to be of public use in the transportation of property, the public claim to such use ought to be liberally supported" (id., at 458-459).
Necessity of use by the public was essential to the Morgan Court when it crafted this definition from its English ancestor. *602 Inasmuch as the English common-law rule was "but an outgrowth or product of the peculiar circumstances and necessities of the people with whom it originated," the New York rule found its basis in New York necessities (id., at 459). Because "valuable products", namely timber, "would have no avenue to market" the public easement could not be restricted, as in England, to those streams navigable by boats or rafts. Instead, those "capable of floating to market single logs or sticks of timber" could be also deemed navigable-in-fact (id., at 459).
In addition to Morgan v King, ALC relies on Douglaston Manor v Bahrakis (89 N.Y.2d 472) in which we quoted a "commercial" definition of navigable-in-fact from the Navigation Law  a river is navigable-in-fact if it is
"`navigable in its natural or unimproved condition, affording a channel for useful commerce of a substantial and permanent character conducted in the customary mode of trade and travel on water * * * hav[ing] practical usefulness to the public as a highway for transportation'" (id., at 480, quoting Navigation Law § 2 [5]).
The Court in Douglaston Manor, however, was not asked to decide whether a waterway was navigable-in-fact. Instead, the Court had to determine whether the public had a right to fish in the Salmon River, which was concededly navigable-in-fact. In holding that the public did not have that right, the Court maintained the distinction between those waters that are navigable-in-law, that is, those that partake of the sea and are thus dedicated to the public use, including the right to fish, and those waters, above the tide, that are navigable-in-fact, over which the public retains only a servitude for transportation.
Using this navigability language from Douglaston Manor as persuasive authority, however, does not necessarily bolster ALC's view that the ability to carry goods to market is the sole criteria in determining the question of navigability. Both the Navigation Law definition and that of Morgan have as their touchstone the idea that a river must have "practical usefulness to the public as a highway for transportation" (Navigation Law § 2 [5]). The fact that before the middle of the 20th century a river's practical utility was measured by its capacity for getting materials to market does not restrict the concept of usefulness for transport to the movement of commodities. Although *603 evolving necessities and circumstances may warrant a different emphasis regarding a river's usefulness, the central premise of the common-law rule remains the same  in order to be navigable-in-fact, a river must provide practical utility to the public as a means for transportation. Thus, while the purpose or type of use remains important, of paramount concern is the capacity of the river for transport, whether for trade or travel (see, Van Cortlandt v New York Cent. R. R. Co., 265 N.Y. 249, 254-255; Fulton Light, Heat & Power Co. v State of New York, 200 N.Y. 400, 412; Fairchild v Kraemer, 11 AD2d 232, 235).
Certainly, as all members of the Appellate Division panel held, evidence of recreational use will support a finding that a river is susceptible to commercial use. Beyond this, however, evidence of a river's practical utility for transport need not be limited to evidence of its capacity for the movement of commercial goods. By offering opinions of river guides regarding the feasibility of running boat tours of the South Branch, both plaintiff and defendants correctly recognize that recreational boating has commercial aspects. More importantly, however, unlike the circumstances presented to this Court when Morgan was decided in 1866, the necessity of using the South Branch as a means of moving goods in commerce has waned. Once one of the five busiest rivers in New York for the transport of logs, it appears that the South Branch has not again been used for that purpose since 1948, and the possibility of such use in the future is unlikely. Today logs are transported by truck.
The declining need to use rivers for commercial logging coincides with changing attitudes toward the preservation of our natural resources. Rivers, long-recognized as unique natural resources, are no longer primarily subjects of commercial exploitation and gain but instead are valued in their own right as a means of travel. Indeed, the Legislature has enacted a system to designate rivers either "wild, scenic [or] recreational" in order to protect their "historic, ecological and recreational values" (see, ECL 15-2701). In line with these modern circumstances and our precedents, we are satisfied that recreational use should be part of the navigability analysis.
Appellant's fear that consideration of recreational use unduly broadens the common-law standard and threatens private property rights is unfounded. We do not broaden the standard for navigability-in-fact, but merely recognize that recreational use fits within it. Many cases, including Morgan v King, support the view that a river navigable by small boat, raft or skiff *604 is subject to the public easement (see, e.g., People ex rel. Lehigh Val. Ry. Co. v State Tax Commn., 247 N.Y. 9, 11 ["(m)otor boats, row boats, rafts and skiffs"]; People ex rel. Erie R. R. Co. v State Tax Commn., 266 App Div 452, 454 ["rowboats and canoes"], affd 293 N.Y. 900; People ex rel. New York Cent. R. R. Co. v State Tax Commn., 258 App Div 356, 360 ["small boats" and "rafts"], affd 284 N.Y. 616; see also, Morgan v King, supra, 35 NY, at 458 [single logs]). Morgan did not limit the common-law rule, but expanded it to include mill-logs. Here, we recognize what was assumed in Morgan  that boaters can make use of the common-law easement. We only hold that such transport need not be limited to moving goods in commerce, but can include some recreational uses. Practical utility for travel or transport nevertheless remains the standard.
Furthermore, property rights are not materially altered by this holding. Riparian owners retain their full panoply of rights, subject only to the long-recognized navigational servitude. As we emphasized in Smith v Odell (234 N.Y. 267, 272), and reiterated in Douglaston Manor v Bahrakis (supra, 89 NY2d, at 481):
"[T]here is no necessary conflict between the reservation to the public of the right of navigation and the recognition of the exclusive privilege expressly granted to the owner. The public right, whatever it might otherwise be, must be held limited in such a situation to the right to use the waters for the purposes of a public highway. * * * [T]he easement of passage over navigable waters does not involve a surrender of other privileges which are capable of enjoyment without interference with the navigator."
Having never owned the easement, riparian owners cannot complain that this rule works a taking for public use without compensation (see, Morgan v King, supra, 35 NY, at 457-458; see also, Soon Duck Kim v City of New York, 90 N.Y.2d 1, 6-7; Matter of Gazza v New York State Dept. of Envtl. Conservation, 89 N.Y.2d 603, 613-614; Lucas v South Carolina Coastal Council, 505 US 1003, 1027).

II.
Even if recreational use can be considered in addition to commercial use, a conclusion we now endorse, ALC nonetheless argues that questions of fact persist regarding the South *605 Branch's capacity for such uses. Although the question of navigability can in some circumstances be decided as a matter of law (see, e.g., Morgan v King, supra), on the record before us we agree with ALC that the remedy of summary judgment is inappropriate (see, Andre v Pomeroy, 35 N.Y.2d 361, 364).
In reaching this conclusion, we do not rely on the fact that both sides reach different conclusions on the ultimate question of navigability. Navigability turns on evidence of actual practical use or evidence of capacity for practical use. There may be experts in geology, hydrology, economics, fluvial geomorphology,[*] and even expert canoers and river guides, among others, who can provide evidence of actual use or evidence of the river's capacity, but the ultimate conclusion  navigability-in-fact  in this case, is for the trier of fact based on the evidence.
Accepting the truth of the data in ALC's affidavits (see, Patrolmen's Benevolent Assn. v City of New York, 27 N.Y.2d 410, 415), we are unable to conclude, as a matter of law, that the historical log drives on the South Branch were not accomplished by use of dams and other artificial augmentation of the river flow. Central to this Court's holding in Morgan was the fact that the portion of the Raquette River there held to be nonnavigable could be used for logging only with the aid of artificial improvements (Morgan v King, supra, at 460). The standard requires that navigability be determined by the river "in its natural state and its ordinary volume" (id., at 459). Moreover, it is not necessary that the stream
"be capable of being * * * navigated, against its current * * *. Nor is it essential to the easement, that the capacity of the stream, * * * should be continuous, or, in other words, that its ordinary state, at all seasons of the year, should be such as to make it navigable. If it is ordinarily subject to periodical fluctuations in the volume and height of its water, attributable to natural causes, and recurring as regularly as the seasons, and if its periods of high water or navigable capacity, ordinarily, continue a sufficient length of time to make it useful as a highway, it is subject to the public easement" (id., at 459).
Thus, in Morgan, the Raquette River could not be considered *606 navigable-in-fact given that, even with the utilization of dams and teams of loggers, the river was usable for less than two months (id., at 459).
Here, the parties have offered conflicting evidence concerning whether the South Branch was able to be used for logging without artificial augmentation. Plaintiff has submitted photographs of the remnants of many dams, three of which are in the South Branch itself, as well as flow data and historical accounts of logging on the river in support of its claim that artificial means were necessary to render the South Branch capable of commercial use. Plaintiff also proffers the affidavit of its historian, who, on review of various historical documents and from interviewing individuals connected with the logging industry, concluded that logging was only accomplished through an extensive system of impounding dams and the use of tremendous manpower. Moreover, the historian also indicated that the log drives lasted only a short time, often less than two weeks.
Yet, none of the evidence on which the historian relies is conclusive. Although dams may have been used, it is not clear from the documents whether dams were essential. The use of dams may have only increased what was already a sufficient flow in the South Branch. It also remains unclear whether it was the capacity of the South Branch or the logging company's own time frame which set the length of time of the logging drives.
Defendants rely on the fact that ALC's contracts for use of the South Branch for logging with the Gould Paper Company from 1926 to 1948 prohibited the construction of dams for use in logging. The contracts state that Gould Paper "will not build any dam or place any obstruction in said portion of the south branch of the Moose River or in any way interfere with the natural flow thereof." Although defendants offer evidence of ALC's scrupulous monitoring of its contracts, when and if dams were built and the necessity of their use cannot be determined from the record before us. Contrary to the dissent, the parties' submissions fail to compel a conclusion that practical, commercial use of the South Branch occurred in its "natural state and its ordinary volume."
Similarly, the evidence of recreational use does not compel the conclusion that substantially unobstructed travel on the South Branch can occur periodically or seasonally (see, Morgan v King, supra, at 459). Defendants are correct, however, that *607 the existence of occasional natural obstructions do not destroy the navigability of a river (People ex rel. Erie R. R. Co. v State Tax Commn., 266 App Div 452, 454, supra; New York Power & Light Corp. v State of New York, 230 App Div 338, 342 [riffs and shallows do not effect river's general navigable character]; Frazee Milling Co. v State of New York, 122 Misc 545, 547 [rapids or obstructions]; see also, Matter of Niagara Falls Power Co. v Water Power & Control Commn., 267 N.Y. 265, 270; Danes v State of New York, 219 N.Y. 67, 71 [dicta]; Sawczyk v United States Coast Guard, 499 F Supp 1034, 1039 [WD NY]). Following naturally from this proposition is that in order to circumvent these occasional obstacles, the right to navigate carries with it the incidental privilege to make use, when absolutely necessary, of the bed and banks, including the right to portage on riparian lands (People ex rel. Erie R. R. Co. v State Tax Commn., supra, at 454; People v Kraemer, 7 Misc 2d 373, 383-384, corollary proceeding sub nom. Matter of Kraemer v County Ct., 7 AD2d 644, affd 6 N.Y.2d 363; see also, Restatement [Second] of Torts § 193, comment d). On the other hand, any use of private river beds or banks that is not strictly incidental to the right to navigate gives rise to an action for trespass (cf., Brewster v Rogers Co., 169 N.Y. 73, 78).
The individual defendants' trip down the South Branch is evidence of navigability, but that event is not enough to demonstrate that the river periodically has sufficient natural volume for a sufficient portion of the year to make it useful as a means for transportation (see, Morgan v King, supra, 35 NY, at 459). The record contains conflicting or inconclusive evidence regarding the river's ability to sustain commercial boating or canoeing operations or its capacity to float individual canoeing excursions for any given period or season.
For example, the parties proffer evidence of the river's capacity to sustain commercial whitewater rafting or canoeing ventures. Although a biologist and an economist retained by defendants aver that the river would have utility for such commercial undertakings, the river guide retained by plaintiffs opined that because of the unpredictability of water flow the South Branch provides no commercial value for such ventures. This evidence along with the proffered water flow data is simply inconclusive as to the river's seasonal or periodic capacity.
The record thus presents issues of material fact that must be determined in a plenary trial, and that are not ripe for summary judgment.

*608 III.
The final point ALC raises regards collateral estoppel. It claims that a 1948 decision of the Board of the Black River Regulating District that determined that the South Branch of the Moose River was not navigable precludes relitigation of this issue by some parties to the current action. Although that decision was confirmed in a CPLR article 78 proceeding at the Appellate Division (Matter of Adirondack League Club v Board of Black Riv. Regulating Dist., 275 App Div 618), shortly thereafter the Legislature passed an act that prohibited the building of the dam that was the subject of the proceeding. On appeal to this Court, we noted that the legislative act had mooted the case, but since a dismissal of the appeal would have left the decision of the Appellate Division intact as precedent, we remitted with directions to dismiss the petitions on mootness grounds (301 N.Y. 219, 222-223). In such instance, no party is collaterally estopped from litigating the issue of the navigability of the South Branch of the Moose River on the basis of that prior determination.
Accordingly, the judgment of Supreme Court and the order of the Appellate Division brought up for review should be modified, without costs, by denying defendants' motions for summary judgment and, as so modified, affirmed.
BELLACOSA, J. (dissenting).
My judgment of this case coincides with that of former Justice Casey expressed for the majority ruling at the Appellate Division (201 AD2d 225). Thus, I respectfully dissent and vote to affirm the decision that granted summary judgment in favor of the defendants and intervenors, including the State of New York. Enough conclusive evidence was amassed to resolve this case at the summary judgment juncture, without the necessity of a trial.
One facet of this case is relatively easy for me. I agree with the governing law principle articulated in Judge Ciparick's opinion for the Court. The traditional commercial viability test, used to determine navigability-in-fact of a waterway, survives (see, Morgan v King, 35 N.Y. 454, 459), and is updated to include a modernized influx of realistic recreational usage (see, State of New York ex rel. New York State Dept. of Envtl. Conservation v Federal Energy Regulatory Commn., 954 F.2d 56).
The recreational appreciation provides legitimacy to a vital and progressive utilization that is itself commercially cognizable and valuable in this day and age. This commonsense definition of navigability-in-fact for the Adirondack's South Branch *609 of the Moose River thus evolves as a nonradical standard for today's law climate and environmental culture (see, Douglaston Manor v Bahrakis, 89 N.Y.2d 472, 481).
The harder part of arriving at a decision in this case, as I see it, is the application of the refreshed rationale to the prodigious record, developed by the contending parties over the years of this long-standing dispute. I can fully appreciate that before finally resolving any lawsuit, especially one suffused with enormous practical and precedential consequences, decision-makers would yearn for more definitive and deeper levels of deliberative excursion and adversarial fact exploration.
Yet, some cases materialize and qualify for a more summary decisive modality by their nature and through the ordinary calculus of judicial sifting for genuine triable issues of fact. This is accomplished within the finite universe of a case record. The moment of decision in such exceptional situations can coalesce when essential matter can be sorted out from satellite ingredients. The judicial process is then allowed reliably to seize the moment and boldly risk a nontrial, summary judgment resolution, in the justifiable discharge of its responsibility (see, e.g., Stringfellow's of N. Y. v City of New York, 91 N.Y.2d 382; Romano v Stanley, 90 N.Y.2d 444 [both cases dealing with use of experts' proofs in a summary judgment context]).
The above-stated rubrics are persuasive for how this case may be decided. In addition, the Principle of Occam's Razor wisely warrants affirmance here on its theory that simpler solutions usually supply the more likely correct answer. Thus, I am led to the less complicated, matter-of-law formula. Avoiding the trial step toward a well founded decision is appropriate to this unique procedural configuration and controversy. Summary judgment is a thoroughly suitable procedural remedy for dealing with this somewhat esoteric subject matter; CPLR 3212 is hardly an insupportable shortcut under these circumstances (see, e.g., Stringfellow's of N. Y. v City of New York, supra).
I acknowledge, however, that reasonable minds see records and cases differently, and adjudicate them with nuanced refinements. Therefore, our respective analytical approaches occasionally reach varying conclusions not only as to the method of resolution of a case, but also as to the substantive result and justification for it. Demonstrably, we five Judges have each deeply examined and seriously considered together the same record materials. Still, my deliberative journey ends at a different destination from the majority.
*610 My vote is based on my over-all assessment that no germane issues persist that might materially affect the outcome of this litigation. The pivotal difference between us, as I see the matter, is whether highlighted issues are either necessary or essential to further trial disputation. My colleagues emphatically conclude that more is needed; I, on the other hand, am satisfied that a decision for this case is justified at this procedural crossroads.
Summary judgment proofs have been assembled by the parties and intervenors and the submissions of various amici curiae. They amass comprehensive, excellent exhibits, unassailable documentations, experts' proofs and massive historical detail and tracings. The record is overflowing with impressive maps, photographs, documents and experts' affidavits and testimony, as well as the sworn statements of individuals who have studied the river and its history, including some who have recently navigated its full course. While I am able to satisfy myself that enough has been adduced here concerning the essentials to rule on this controversy, I emphasize that my view is based not merely on some single factor nor on the accumulated quantity of proof, but rather on the substantial record and on the substantive quality of all its features.
Former Justice Casey correctly summarized for the majority at the Appellate Division that "undisputed" evidence exists to warrant a matter-of-law determination that the South Branch of the Moose River is a navigable-in-fact waterway (201 AD2d 225, 231, supra). In particular, moreover, I credit the Appellate Division majority's double-barreled justification that "[b]ased upon the undisputed evidence of the river's historic use as a major log-driving stream for some 50 years and its recent use by recreational canoeists, * * * the South Branch of the Moose River is navigable in fact" (id., at 231).
We all agree that an early beacon light is the Morgan case (supra). It is of a different age, but still helps to rank this river, in a legal sense, and as a matter of law. The Morgan case, the documented history of this river and this summary judgment record, thus, converge as a reliable rudder for judicial closure of this well and thoroughly fought encounter.
The documented and varied uses of this river, principally for logging in the past and for recreational purposes more recently, chart its natural capacity for historical and economical acclimatization to practically utilized uses for all time. Society and the law recognize that the river's uses may vary from time *611 to time, and season to season. That, however, is not a dispositive detail, standing alone (see, Morgan v King, supra, at 459). Frankly, that is part of the nature and timelessness of the river.
Likewise, evidence that some dam-like structures were used along the river, especially during the river's log-driving history in the first half of this century does not overcome the potent conclusion that the river, on its own, was a naturally created force and waterway. Some degree of human augmentation to the particular practical use may be viewed as naturally ancillary and appropriately incidental, but that should not negate navigability-in-fact, as a matter of law on this record.
Moreover, the successful voyage over the section of the river at issue by several recreationalists, including individual defendants in this case  charged by plaintiff with being trespassers  dramatically demonstrates the river's renaissance as an eclectically utilized water course in this second half of the twentieth century. Indeed, a member of plaintiff Adirondack League Club  which sues to enforce its private and exclusive use of its part of the river (compare, Douglaston Manor v Bahrakis, supra)  also periodically traversed the river. The club seeks to preserve that privilege only for its members to the exclusion of all others, including the public easement users, that the club's lawsuit would adjudicate as trespassers. To be entitled to that ultimate declaration and injunction, it has to prove the non-navigability-in-fact of this river. This customary plaintiff's burden, though not an issue at this summary judgment stage of litigation, is importantly framed for the now ordered trial by the context of the history and the varied expeditions. They tend to show that the river still embodies its erstwhile navigational commercial logging use heritage, in conjunction with its evolved and present-day uses as a navigable body of water for recreational purposes, as well. Additional expert evidence and a trial credibility contest will not, in my view, materially change this cogent amalgam of undisputed facts and essential evidence.
Impressively in relation to this case, the natural sciences, in special subcategories of fluvial geomorphology, archeology and economics  as those disciplines bear on private and public ownership of land, waterways and riparian rights  swirl together into common basins of law and public policy (see, ECL 15-0105 [2], [3]; see also, Wilson, Consilience, The Unity of Knowledge, at 5, 61, 64 [Knopf 1998] ["In an early letter to his friend Marcel Grossmann (Einstein) said, `It is a wonderful *612 feeling to recognize the unity of a complex of phenomena that to direct observation appear to be quite separate things.'"]). In a related sense, incontrovertible proven phenomena from this record provide a sufficient confluence to support my assessment, and that of the Appellate Division, that a summary judgment stage decision ought to be upheld.
Life, law and nature are filled with paradoxes (see, The Paradoxes of Legal Science in Cardozo, Selected Writings of Benjamin Nathan Cardozo [Margaret E. Hall ed 1947]). Facts can be epistemologically elusive, and people (particularly Judges and lawyers) often struggle with inexplicable puzzlements which seem persnickety and even nettlesome. Most of us prefer, instead, levels of certainty and tidiness in life, law and nature. I appreciate that the South Branch of the Moose River, the law and litigation affecting the river's future and use, and this record may together be perceived as a frustrating roil of elusiveness. Yet, the judicial role and responsibility are to confidently decide, as best they can, based on what has been adduced when the decisive moment dawns.
For a closing note, I underscore that neither my dissenting view nor the majority's prevailing direction for a trial, should be interpreted as a precedential Waterloo for either environmental camp in this dispute. Whatever the outcome, including after evidentiary, factual, credibility and expert witness joustings at the ordered trial, the unique role of the judicial process is to provide a fair, objective, measured and particularized forum for resolution of this donnybrook. Stare decisis aside in the long haul of history, the Law of Nature will ultimately determine whether the Moose River is navigable, no matter what litigants, lawyers, judges or juries may say on the subject.
Respectfully, my vote is to affirm the order of the Appellate Division.
Judgment of Supreme Court and order of the Appellate Division brought up for review modified, etc.
NOTES
[*] Fluvial geomorphology is the science of the nature of rivers, their hydrology, hydraulics, and geology.
[*] Designated pursuant to NY Constitution, article VI, § 2.