CHARLES KHOURY, as Administrator, etc., of NICHOLAS KHOURY, Deceased, Respondent, *v.* COUNTY OF SARATOGA, TOWN OF MOREAU and Others, Appellants, Impleaded with CHARLES IZZO and Another, Defendants.*

MOSES CARMA, by LOUIS G. CARMA, His Guardian ad Litem, Respondent, *v.* COUNTY OF SARATOGA and Others, Appellants, Impleaded with TOWN OF MOREAU and Others, Defendants.*

LOUIS G. CARMA, Respondent, *v.* COUNTY OF SARATOGA and Others, Appellants, Impleaded with TOWN OF MOREAU and Others, Defendants.*

Third Department, January 11, 1935.

* Affd., 267 N. Y. 384.

*John W. Nichols*, for the appellant County of Saratoga.

*Lawrence B. McKelvey* [*Brenton T. Taylor* and *James J. McNaughton* of counsel], for the appellant Town of Moreau.

*Beecher S. Clother*, for the appellant County of Warren.

*C. E. Fitzgerald* [*James McPhillips* and *J. Edward Singleton* of counsel], for the appellant City of Glens Falls.

*Chambers & Finn* [*Walter A. Chambers* and *James A. Leary* of counsel], for the respondent Charles Khoury, as administrator, etc.

*Leary & Fullerton*, for the respondents Moses Carma and Louis G. Carma.

BLISS, J. At about nine-thirty P. M. on the evening of November 3, 1932, two boys, Nicholas Khoury and Moses Carma, were walking on the easterly sidewalk of the concrete highway bridge spanning the Hudson river from the city of Glens Falls in the county of Warren on the north to the town of Moreau in the county of Saratoga on the south, when they were suddenly struck by an automobile proceeding in a southerly direction across this bridge, driven by the defendant Charles Izzo and owned by his wife, Agnes D. Izzo. The defendant Charles Izzo, testifying as a witness for the plaintiffs, said that he had crossed this bridge on two previous occasions that same evening, once at about eight o'clock when he drove southerly to his home in South Glens Falls and again at eight-thirty o'clock when he drove back from South Glens Falls into Glens Falls. On each of these previous occasions the surface of the roadway was dry. On his last trip southerly at about nine-thirty P. M. Izzo stopped the car at a red light 100 feet north of the northerly end of the bridge. At this moment another car passed him going in a southerly direction and proceeded on to the bridge. Izzo watched it and when this other car had reached a point in about the center of the bridge, 600 feet to the south of Izzo, he saw it start to skid on some ice on the bridge.

When the traffic light turned green, Izzo proceeded on to the bridge, shifting his car first into low gear, then into second and finally into high gear. About 500 feet to the south of the traffic light, or about 100 feet from the center of the bridge, he was traveling at a speed of from fifteen to twenty miles an hour when suddenly the car skidded, picked up speed, spun around, mounted the six-inch curb on to the easterly sidewalk and struck the two boys, killing Nicholas Khoury and injuring Moses Carma seriously. At the time of the accident there was a very dense mist like a fog enveloping the center of the bridge and rising from the water flowing underneath the bridge. Izzo had noticed this mist coming up from the river when he crossed the bridge on the previous occasions that evening.

The bridge itself is a modern, concrete structure with a paved roadway in the center for vehicles and a sidewalk on each side for pedestrians. Along the outside edges of the sidewalks are substantial concrete parapet walls. Between the inside edges of the sidewalk and the driveway there are six-inch curbs. It was erected in 1913 and for many years safely served the needs of the traveling public. West of the bridge is a considerable fall in the Hudson river with a dam erected at its crest. By this dam water was diverted to mills, particularly a large pulp mill along the southerly side of the river. Down stream from this falls and continuing under the bridge to the east are a series of rapids. During the last six or seven years, at recurring intervals when stream, wind and weather conditions were just right, a heavy mist or spray would rise from the river and envelop part or all of the bridge. In freezing weather this would coat the bridge with a thin veneer of ice. The rising of the spray from the river began when the paper mill on the south side of the river closed down and the water which formerly went through the flume to the mill then went over the dam and thus augmented the previous flow. This, coupled with a wind from the right direction, would cause a mist to rise from the river and envelop the bridge. Then, when the temperature was at or below freezing the bridge would become coated with ice. On many such occasions the surface of the highway leading to the bridge would be dry while the driveway near the center of the bridge would be icy. There had been several other accidents, including one fatality, caused by this icy condition. This dangerous condition and plans for its correction had been the subject of discussion both by the town board of the town of Moreau and the common council of the city of Glens Falls, and an engineer had prepared plans for the erection of barriers between the sidewalks and the roadway. The only corrective measure actually

adopted by the two municipalities having immediate charge of the maintenance of the bridge was to spread sand over the ice, but no sand had been spread on the night of the accident.

The case was tried and submitted on the theory of a public nuisance and verdicts were had by the plaintiffs. The appealing defendants now contend that no nuisance was shown to exist and urge that they must have either created or expressly consented to the creation of the defective condition of the highway before they could be charged with maintaining a nuisance. They also argue that if a defective condition has resulted from the acts of others, then the municipalities are not the creators of the nuisance and their sole duty is to abate the same after notice and that the failure to remove the nuisance involves a question of negligence and not nuisance.

The classic example of a public nuisance is the omission to repair a highway or the placing of obstructions in a highway.

" ' A common nuisance is an unlawful act or omission to discharge a legal duty, which act or omission endangers the lives, safety, health, property or comfort of the public, or by which the public are obstructed in the exercise or enjoyment of any right common to all ' his ' Majesty's subjects.' Omission to repair a highway, or the placing of obstructions in a highway or public navigable river, is a familiar example." (Pollock Law of Torts [13th ed.], 418.) The Court of Appeals has denominated this concept of nuisance as a " nuisance growing out of negligence."

" If danger there was, then also there was nuisance, though nuisance growing out of negligence. Nuisance as a concept of the law has more meanings than one. The primary meaning does not involve the element of negligence as one of its essential factors. (*Heeg* v. *Licht*, 80 N. Y. 579.) One acts sometimes at one's peril. In such circumstances, the duty to desist is absolute whenever conduct, if persisted in, brings damage to another. (21 Halsbury, Laws of England, p. 507, § 845.) * * * Other situations there are, however, where what was lawful in its origin may be turned into a nuisance by negligence in maintenance. The coal hole, built under a license, may involve a liability for nuisance, if there is negligence in covering it. (*Trustees of Canandaigua* v. *Foster*, 156 N. Y. 354.) The tumbledown house abutting on a highway is transformed into an unlawful structure if its ruinous condition is a menace to the traveler. (*Timlin* v. *Standard Oil Co.*, 126 N. Y. 514.) In these and like situations, the danger being a continuing one, is often characterized as a nuisance, though dependent upon negligence. Indeed, one of the most familiar instances of nuisance is a highway out of repair. (Pollock Torts [10th ed.],

p. 1016.) Narrow, too, is the line between nuisance and negligence. One can create a nuisance by leaving a wagon in the street. (*Cohen* v. *Mayor, etc., of N. Y.*, 113 N. Y. 532.) If the danger threatens the public, the nuisance is classified as common; private, if it threatens one person or a few (Halsbury, *supra*, p. 515, § 865)." (*McFarlane* v. *City of Niagara Falls*, 247 N. Y. 340, 343.) The case at bar fits perfectly within these definitions. There was here created at recurring intervals a situation dangerous to the traveling public which the municipalities charged with the maintenance of this bridge after ample notice had failed to remedy for a period of years. The long-continued negligence ripened into nuisance. The liability became absolute instead of relative.

The next question is one of causal connection. It may be argued, not without some strength, that the icy condition of this bridge was not the proximate or decisive cause of this accident; that the negligence of the driver of the automobile was an intervening cause, a break in the chain of causation between the ice on the highway and the injuries to the plaintiffs; that the continued negligence of the responsible municipalities was but passive while the negligence of the defendant Charles Izzo was active. One might possibly urge that the ice on the bridge was merely one of the conditions surrounding the accident and that the negligence of the driver Charles Izzo was the decisive cause. This question, however, is not open in our court. In *Kirchner* v. *State of New York* (223 App. Div. 546) we held that the negligence of the State in creating and maintaining a slippery condition on the highway and the negligence of the driver of an automobile who drove his car over the highway in that condition concurred to produce the disastrous result. We there said: " The State was negligent in creating and maintaining a dangerous condition in the highway and Akers was negligent in the manner in which he drove his car over the highway in that condition. Without the negligence of each, the result would not have happened and they were jointly and severally liable." Also under the proof here the jury might have found that those charged with the maintenance of this bridge should reasonably have foreseen that some one would carelessly drive over this icy bridge and cause injury to a pedestrian on the sidewalk. Under such circumstances the negligence of the careless driver would not prevent the municipalities from being liable. (American Law Institute, Restatement of the Law of Torts [Negligence], § 449.) Then, too, the appealing defendants have not raised the question of causation.

The last serious question left for our consideration is the responsibility for the condition of this highway. Whose was the duty

of maintenance? The appealing counties say the obligation was not theirs. At the time this bridge was constructed there was a dispute as to who should pay for it and this court held in *People ex rel. City of Glens Falls* v. *County of Warren* (170 App. Div. 144; affd., 218 N. Y. 708) that the counties were chargeable with a portion of the cost of construction under section 250 of the Highway Law. This section of the law, however, merely imposed upon the counties a portion of the cost of construction, care and maintenance of county line bridges. The actual duty of maintenance of a bridge such as this is by section 47 of the Highway Law placed upon the town superintendent of highways. This has been the situation in New York State for many years.

" The duty to repair a bridge on a highway which has become out of repair is imposed by statute upon some local authorities. Under the general statutory system of this State the duty is placed on the towns or municipalities in which they are located, and not upon counties, as in England, although many exceptions have been created by special statute. (*Hill* v. *Supervisors of Livingston County*, 12 N. Y. 52.) " (*People ex rel. Keene* v. *Supervisors*, 142 N. Y. 271, 276.)

" It is conceded that primarily the duty to repair a bridge on a highway which has become out of repair is generally placed upon the town or municipality in which it is located. (*People ex rel. Keene* v. *Supervisors of Queens Co.*, 142 N. Y. 271, 276; *People ex rel. Morrill* v. *Supervisors of Queens Co.*, 112 N. Y. 585, 587; *Hill* v. *Board of Supervisors, Livingston Co.*, 12 N. Y. 52, 57; Highway Law, section 250.) " (*Town of Saratoga* v. *Greene*, 240 N. Y. 127, 131.) (See, also, *Hill* v. *Board of Supervisors of Livingston County*, 12 N. Y. 52, 57, and *People ex rel. Morrill* v. *Supervisors*, 112 id. 585, 588.) As to the city of Glens Falls, it does not deny its own joint responsibility for maintenance, but urges that the counties are liable with it jointly. While under section 250 of the Highway Law these counties must each pay one-sixth part of the expense of maintenance, nevertheless no statute has been called to our attention which specifically imposes upon an officer of a county the actual duty of maintenance of a county line bridge. It is true that under section 33 of the Highway Law a county superintendent of highways has the general charge of all bridges within his county and general supervision of the work of repairing the same, nevertheless that does not impose upon him the immediate and actual performance of the work. This must be performed by the town superintendent of highways. This has been specifically held by our court in *Matter of Town of Saratoga* (160 App. Div. 60; affd. without opinion, 211 N. Y. 543). The functions of the county

with relation thereto were held to be governmental. The administrative duties were imposed upon the towns through their superintendents of highways. It was held that reparation for a portion of the expense might be had from the counties, but that is not the question here involved. The actual practice in such cases is that the town superintendents of highways make the repairs to and maintain a county line bridge and a portion of that expense is charged back to the counties involved. Under these circumstances the waiver of liability contained in section 6 of the County Law does not apply to the counties of Warren and Saratoga because neither these counties nor any officer thereof were charged with the actual duty of maintenance or repair.

The judgments and orders appealed from in the Khoury action should be affirmed as to the city of Glens Falls and the town of Moreau, and reversed and the complaints dismissed as to the counties of Warren and Saratoga. The judgments and orders appealed from in the Carma actions should be affirmed as to the city of Glens Falls and reversed and complaints dismissed as to the counties of Warren and Saratoga.

HILL, P. J., RHODES, CRAPSER and HEFFERNAN, JJ., concur upon the question of the existence of the nuisance; HILL, P. J., votes with BLISS, J., to dismiss as against the two counties; RHODES, CRAPSER and HEFFERNAN, JJ., vote to affirm the judgments and orders in their entirety.

Judgments and orders affirmed, with costs in one action.