OPINION OF THE COURT
Garry, J.
Plaintiffs are the collective owners of thousands of acres of real property in a remote area of the Adirondack Mountains in the Town of Long Lake, Hamilton County. The land was conveyed by defendant State of New York to Benjamin Brandreth in 1851 and, as pertinent here, has remained since then in the private ownership and control of descendants of the Brandreth family. Plaintiffs’ property is bounded on the north by the William C. Whitney Wilderness Area, which was formerly privately owned, but had been fully acquired by the State by 1998, and now consists of over 20,000 acres of State forest preserve land. Within the Wilderness Area, a canoeing waterway known as the Lila Traverse Section of the Whitney Loop permits canoeists to travel across a network of lakes, ponds, streams and canoe carry trails maintained by defendant Department of Environmental Conservation (hereinafter DEC) between Little Tupper Lake on the Wilderness Area’s eastern side and Lake Lila on the western side.
The subject of this litigation is a two-mile-long system of ponds and streams known as the Mud Pond Waterway (hereinafter the Waterway) that crosses the northernmost corner of plaintiffs’ property between two water bodies in the Wilderness Area: Lilypad Pond on the northeast and Shingle Shanty Brook on the northwest. Both of these bodies of water are part of the Lila Traverse, and shortly after this part of the Wilderness *24 Area entered public ownership, DEC constructed an .8-mile carry trail between them in order to permit canoe travelers to use the Lila Traverse without entering plaintiffs’ property or using the Waterway. Defendants now assert that canoeists are not obliged to use the carry trail, arguing that even though the Waterway is located on privately owned property, it is navigable-in-fact and therefore open to public use. Plaintiffs disagree, contending that the Waterway is their private property and that they are entitled to exclude members of the public from using it.
In May 2009, defendant Phil Brown, the editor of a publication called Adirondack Explorer, explored the question of the Waterway’s navigability-in-fact by canoeing through it. In a subsequent article entitled “Testing the Legal Waters,” Brown reported that he began his trip at a DEC access point on Little Tupper Lake and then traveled westward across the various lakes, ponds, streams and portages that make up the Lila Traverse until he reached Lilypad Pond. At that point, instead of exiting the pond and using the DEC carry trail, by which he could have reached Shingle Shanty Brook without leaving State-owned land, Brown canoed across Lilypad Pond into a narrow neck or outlet that crosses plaintiffs’ property line. Brown saw and photographed plaintiffs’ no trespassing signs at the boundary, but continued past them into Mud Pond — a shallow body of water comprising about 40 acres — and then to the pond’s western edge, where the Mud Pond Outlet Brook begins. The first 500 feet of the Outlet Brook consist of rapids, which Brown avoided by removing his canoe from the water and portaging for approximately .1 miles on a nearby carry trail that plaintiffs had constructed and maintained for their own use. He reentered the Outlet Brook below the rapids, canoed westward to this stream’s confluence with Shingle Shanty Brook on plaintiffs’ property, and then continued northward on this brook for about a mile to the point where it crosses plaintiffs’ property line and reenters the Wilderness Area. Thereafter, Brown completed the Lila Traverse by continuing on Shingle Shanty Brook to Lake Lila, where he exited at a DEC public access point.
Plaintiffs commenced this action after they learned about Brown’s trip, seeking compensatory damages for trespass and a judgment declaring that the Waterway is not navigable-in-fact, and barring the public from using the Waterway and entering plaintiffs’ property. Brown answered and asserted, *25 among other things, that the State was a necessary party. The State and DEC (hereinafter collectively referred to as the State defendants) thereafter moved to intervene as defendants, and Supreme Court granted the motion. The State defendants then answered and asserted counterclaims, including a demand for a declaratory judgment that the Waterway is navigable-in-fact, and that plaintiffs created a public nuisance by interfering with the public’s right to use it. The State defendants further sought an injunction prohibiting plaintiffs from posting the Waterway against trespass. Following discovery, Brown and the State defendants moved and plaintiffs cross-moved for summary judgment. Supreme Court declared that the Waterway is navigable-in-fact, granted the motions for summary judgment by Brown and the State defendants, denied plaintiffs’ cross motion and enjoined plaintiffs from interfering with the right of the public to navigate the Waterway. Plaintiffs appeal.
As a preliminary matter, we note that in rendering its summary judgment determination, Supreme Court stated that it would have been inclined to find triable issues of fact as to the navigable character of the Waterway, but did not do so because the parties had asked the court to render a determination as a matter of law. On appeal, the parties renew that request, jointly advising this Court that the material facts are fully and accurately presented in the record and are not in significant dispute. The determination whether a waterway is navigable-in-fact is heavily dependent on factual evidence and assessments and thus cannot always be resolved as a matter of law (see e.g. Adirondack League Club v Sierra Club, 92 NY2d 591, 605 [1998]; Fairchild v Kraemer, 11 AD2d 232, 236 [I960]; compare Morgan v King, 35 NY 454, 460 [1866]; People ex rel. Erie R.R. Co. v State Tax Commn., 266 App Div 452, 454-455 [1943]). Nevertheless, the parties in a civil dispute may chart their own course in litigation and may agree upon the factual basis for the resolution of a legal controversy (see Matter of Kaczor v Kaczor, 101 AD3d 1403, 1404-1405 [2012]). In view of the comprehensive character of the record and the lack of any major factual disagreements in the parties’ arguments, we grant their mutual request to resolve this matter as a question of law.
Pursuant to the common law, a waterway on private property that is not navigable-in-fact is owned by the adjacent landowners, but a waterway that is navigable-in-fact “is considered a public highway, notwithstanding the fact that its banks and *26 bed are in private hands” (Adirondack League Club v Sierra Club, 92 NY2d at 601; see Morgan v King, 35 NY at 455). The State cannot alienate the right of the public to travel on a navigable-in-fact waterway by transferring title in its bed and banks to a private owner (see Smith v City of Rochester, 92 NY 463, 479 [1883]). As riparian owners never obtain ownership interests in the waters of navigable-in-fact waterways, a judicial determination that the public has the right of navigation does not result in a taking for public use without compensation (see Adirondack League Club v Sierra Club, 92 NY2d at 604).[1] Accordingly, the import of a judicial determination that a waterway is navigable-in-fact is that it has always been open to the public in that character, even though the riparian owners may not have believed it to be, and no trespass was committed by a traveler who navigated upon it before a court ruled upon its navigability.
Where, as here, a waterway passes through privately-owned property, a common-law standard is applicable in determining its navigability. While the Navigation Law contains a definition of navigability-in-fact, that legislation applies to the “navigable waters of the state,” a term that is statutorily defined to exclude privately-owned bodies of water (Navigation Law § 1; see Navigation Law § 2 [4], [5]; People v System Props., Inc., 281 App Div 433, 443-444 [1953]). In addition to this statutory distinction, the common law differentiates between the navigability of waterways on private property and those passing over land owned by the State in its sovereign capacity, such as tidal waters, the Great Lakes, boundary rivers and certain other rivers and lakes (see Douglaston Manor v Bahrakis, 89 NY2d 472, 481-482 [1997]; Town of N. Elba v Grimditch, 98 AD3d 183, 189-190 [2012]). Accordingly, where, as here, the State has no sovereign or proprietary ownership interest in the land and the waterway in question passes through private property, its navigability-in-fact is determined by a common law examination of “evidence of [the waterway’s] actual practical use or evidence of capacity for practical use” (Adirondack League Club v Sierra Club, 92 NY2d at 605). Historically, this analysis turned on whether the waterway had *27 the capacity to be used for commercial transportation; the public was deemed to have the right to travel on “every stream which is capable, in its natural state and its ordinary volume of water, of transporting, in a condition fit for market, the products of the forests or mines, or of the tillage of the soil upon its banks” (Morgan v King, 35 NY at 459). More recently, the Court of Appeals clarified that commercial use is not the only relevant factor, and that a waterway’s capacity for recreational use is also significant in determining its navigability. “[W]hile the purpose or type of use remains important, of paramount concern is the capacity of the river for transport, whether for trade or travel” (Adirondack League Club v Sierra Club, 92 NY2d at 603). The Court of Appeals stated that this holding neither altered nor enlarged the applicable common-law analysis and was “in line with the traditional test of navigability, that is, whether a river has a practical utility for trade or travel” (id. at 600).
Accordingly, the Waterway’s navigability-in-fact must be determined based upon its utility for travel or trade as revealed by the testimony, affidavits, maps, photographs, historical records and other evidence in the voluminous record. Of particular significance is the extensive testimony of Donald Brandreth Potter, a member of plaintiff Friends of Thayer Lake LLC, who has lifelong familiarity with the Waterway and its history. Potter — who was 88 years old when he testified — has been the owner for 55 years of Mud Pond Camp, a hunting cabin near the Waterway that was constructed by his family in 1918. Potter testified that although the Waterway is shallow in some areas and narrow, tortuous and crowded with plant growth in others, it is “generally floatable by canoe” during periods of ordinary water. The rapids below Mud Pond are an exception; Potter testified that this part of the Waterway is never canoeable and must be avoided by use of a 500-foot carry trail that his family constructed and maintains. In addition to maintaining this trail, Potter stated that he and his family routinely maintain the Waterway by removing fallen trees, vegetation and other obstacles that would otherwise block or narrow the channel. Even with such attention, the Waterway below Mud Pond is so narrow and winding that there is no room for large craft or boats with oars; canoes are the only type of vessel that can pass. Nevertheless, Potter’s testimony fully established that, throughout most of its length, the Waterway is capable of being used for canoe travel and has in fact *28 been used for this purpose for many years.[2] This evidence established that the Waterway has “sufficient natural volume for a sufficient portion of the year to make it useful as a means for transportation,” a required element of navigability-in-fact (Adirondack League Club v Sierra Club, 92 NY2d at 607).
The Waterway’s narrow, shallow character does not preclude such a finding, as a stream that can carry only small boats may nevertheless be navigable-in-fact (see People ex rel. Lehigh Val. Ry Co. v State Tax Commn., 247 NY 9, 11-12 [1928]; People ex rel. New York Cent. R.R. Co. v State Tax Commn., 238 App Div 267, 268 [1933], affd 268 NY 519 [1935]). Likewise, neither the portage around the relatively short Mud Pond rapids nor the presence in the Waterway of other incidental obstacles such as beaver dams and fallen trees renders the Waterway nonnavigable, as “occasional natural obstructions do not destroy the navigability of a [waterway]” (Adirondack League Club v Sierra Club, 92 NY2d at 607; see People ex rel. Erie R.R. Co. v State Tax Commn., 266 App Div at 454; see also Matter of City of Niagara Falls v Water Power & Control Comm., 267 NY 265, 270 [1935], cert denied 296 US 609 [1935]). On the contrary, the presence of such occasional obstructions in a navigable-in-fact waterway gives rise to a public right to circumvent them by “mak[ing] use-, when absolutely necessary, of the bed and banks, including the right to portage on riparian lands” (Adirondack League Club v Sierra Club, 92 NY2d at 607).[3]
As for evidence of actual use, Potter’s testimony and family records reveal that — as there are no roads anywhere nearby— his family has always relied on the Waterway as a primary means of traveling to Mud Pond Camp from other parts of their property. Additionally, the family has frequently used it as a route for travel to other bodies of water, including those that now make up the Lila Traverse. Although much of this travel has been undertaken for recreational reasons such as hunting and fishing, the family has also regularly used the Waterway for such utilitarian purposes as transporting goods *29 and supplies to Mud Pond Camp. Potter described the water transportation of food, baggage, equipment, beds, a stove and building materials, such as lumber, doors, windows and shingles. Such items were either brought overland from the north through the area now comprising the Wilderness Area to Lilypad Pond, and then by canoe or guideboat to Mud Pond, or from the south by canoe on Shingle Shanty Brook, Mud Pond Outlet Brook and Mud Pond. The Waterway has also been used to transport deer and other game shot by Potter and his family for their own use, and it saw some limited commercial use in the 1920s and 1930s, when Potter’s father operated a trapping business and sometimes used the Waterway to transport furs to market.
Contrary to plaintiffs’ argument, the fact that the Waterway’s use has been almost exclusively private and recreational rather than commercial does not preclude a determination that it is navigable-in-fact. The standard is phrased in the disjunctive, looking to the stream’s practical utility for “trade or travel” (id. at 603 [emphasis added]). Moreover, the test examines a waterway’s capacity for use and not merely its actual use (see Adirondack League Club v Sierra Club, 92 NY2d at 605; Fairchild v Kraemer, 11 AD2d at 235). The landowners’ longstanding use of the Waterway to transport goods and materials for private use reveals that it has the capacity to transport similar goods for commercial purposes. Further, a waterway’s capacity for commercial use does not depend exclusively on its utility for moving commodities; as the Court of Appeals noted, logs are now moved by truck, and rivers “are no longer primarily subjects of commercial exploitation and gain but instead are valued in their own right as a means of travel” (Adirondack League Club v Sierra Club, 92 NY2d at 603). In this modern view of a waterway’s utility, recreational and commercial uses are often intertwined, as illustrated by the affidavit testimony of the owner of an Adirondack outfitting and guide service, who stated that his business now includes canoe tours in the Wilderness Area, and that he will include the Waterway in this commercial activity if it is judicially declared to be navigable-in-fact.
Plaintiffs’ arguments pertaining to the Waterway’s remote nature are unavailing. The Wilderness Area was privately owned before the late 20th century, and there were no nearby roads or other means of public access; thus, before Brown’s 2009 trip, use of the Waterway was limited almost exclusively *30 to the landowners and their guests.[4] There is some record evidence that the Waterway was briefly used for public recreational canoe travel during the late 1800s, when a popular Adirondack guidebook described a canoe route between Lake Lila and Little Tupper Lake that included the streams and ponds that make up the Waterway, specifically mentioning Shingle Shanty Brook, the portage around the Mud Pond rapids and the ponds now known as Mud Pond and Lilypad Pond. However, a note in the guidebook indicates that the owners eventually withdrew permission for entry “as the privilege was abused.” Other than this guidebook, there is no indication of public use or attempts to gain public access to the Waterway until after the State acquired the Wilderness Area and canoeists began using the Lila Traverse.
Even now, access to the Waterway remains difficult, requiring lengthy canoe travel across the Wilderness Area on the various component lakes and streams of the Lila Traverse and several portages, the longest of which covers 1.75 miles. However, the standard for navigability-in-fact is more concerned with a waterway’s capacity and characteristics than its location. A significant element in determining whether a waterway on private property is navigable-in-fact is whether there are multiple “termini” by which the public can gain access and which provide means by which the waterway can be used for travel to and from other destinations. A body of water on private land that has no inlet, outlet or public access — such that it cannot be reached without crossing private land or cannot be used as a travel route to other destinations — is not navigable-in-fact (see Dale v Chisholm, 67 AD3d 626, 627 [2009]; Mohawk Val. Ski Club v Town of Duanesburg, 304 AD2d 881, 883-884 [2003], abrogated on other grounds 98 AD3d 183 [2012]; Hanigan v State of New York, 213 AD2d 80, 84 [1995]). The Waterway meets this test, as it adjoins public property at both of its termini. Lilypad Pond on the east and Shingle Shanty Brook on the west provide public access to and from the Waterway for travelers from the DEC access points at Lake Lila and Little Tupper Lake, as well as other bodies of water, campsites and hiking trails throughout the Wilderness Area.
*31 Contrary to plaintiffs’ contention, no showing of necessity for public use of the Waterway is required. The references to commercial necessity in the early cases did not result in a requirement for a showing of public need to use a waterway as an element of navigability-in-fact, but instead reflected judicial efforts to adapt English common-law standards of navigability to the needs and characteristics of a new country (see Adirondack League Club v Sierra Club, 92 NY2d at 601-602; Morgan v King, 35 NY at 458-459). The standard is practical utility, not necessity, and when that standard reveals that a waterway is navigable-in-fact, “the public claim to such use ought to be liberally supported” (Morgan v King, 35 NY at 459). The evidence establishes that the Waterway has the capacity to provide practical utility to the public for both trade and travel. Accordingly, we agree with Supreme Court that it is navigable-in-fact and subject to a public right of navigation, including the right to portage on plaintiffs’ land where absolutely necessary for the limited purpose of avoiding obstacles to navigation such as the Mud Pond rapids.[5]
Based on this determination, Supreme Court also properly declared that plaintiffs created a public nuisance by placing cables and no trespassing signs across the Waterway that interfered with the public right of navigation, and enjoined them from continuing to do so (see Blanchard v Western Union Tel. Co., 60 NY 510, 513-516 [1875]; see also Khoury v County of Saratoga, 243 App Div 195, 198 [1935], affd 267 NY 384 [1935]).

. For this reason, and contrary to Brown’s contention, a 2007 deed that purported to transfer some of the affected property “subject [to the] right of the public to navigate” on the Waterway does not affect our analysis, as no private ownership interests affecting such rights had been acquired or could be conveyed.

. Before this litigation was commenced, Potter and a relative escorted two DEC officials on a canoe tonr through the Waterway; at the conclusion of the trip, the officials opined that the Waterway is navigable-in-fact.

. The public right to travel through private property on a navigable-in-fact waterway “does not sweep away or displace other rights accompanying . . . private ownership,” such as exclusive fishery rights (Douglaston Manor v Bahrakis, 89 NY2d 472, 481 [1997]). Public use “that is not strictly incidental to the right to navigate gives rise to [a cause of] action for trespass” (Adirondack League Club v Sierra Club, 92 NY2d at 607).

. Following the publication of Brown’s article describing his 2009 trip on the Waterway, other members of the public followed his lead; plaintiffs’ motion-sensitive cameras have documented the presence of dozens of canoe travelers on the Waterway. While this travel offers additional evidence of the Waterway’s navigable character, we do not rely on it, finding adequate proof in the evidence of the Waterway’s physical characteristics and historical use.

. Our legal analysis applies established precedent, but it bears noting that, in this circumstance, there are some troubling results left unaddressed. Prior to the State’s acquisition of the adjoining lands, there was no question that the Waterway was understood to be private property, not subject to public use. The law is clear that no taking without just compensation results from a determination of navigability-in-fact; however, it appears most unlikely that anyone contemplated that this remote property was burdened by a public easement of any nature when the property was conveyed into private hands in 1851, or indeed, at any time prior to the State’s purchase of the adjoining lands. While it is well established that property ownership rights are not altered by adjudications of navigability-in-fact, we share the dissent’s concern that the application of the rule in cases such as this may destabilize long-established expectations as to the nature of private ownership (compare Douglaston Manor v Bahrakis, 89 NY2d at 481).